James J. Periconi
Delight D. Balducci
PERICONI, LLC
708 Third Avenue, 17th Floor
New York, New York 10017
(212) 213-5500
*Attorney for the Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

CONCERNED CITIZENS OF CHAPPAQUA,
CHARLES NAPOLI, and GINA GORE,

               Plaintiffs,

               v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION (FEDERAL HIGHWAY
ADMINISTRATION), and the NEW YORK
STATE DEPARTMENT OF
TRANSPORTATION,

               Defendants.

-------------------------------------------------------------X

CIVIL ACTION
ECF CASE

DOCKET NO.:
08-CV-7325(SCR)(LMS)

**NOTICE OF MOTION**

     **PLEASE TAKE NOTICE** that upon the annexed affidavit of James J. Periconi, sworn
to on August 18, 2008, and upon the exhibits annexed thereto; the annexed affidavit of Charles
Napoli, sworn to on August 18, 2008, and upon the exhibits annexed thereto; the annexed
affidavit of Peter Bartlett, sworn to on August 16, 2008; the accompanying Memorandum of Law
in support of this motion, and the pleadings herein, Plaintiffs will move this Court, before Judge
Stephen C. Robinson, United States District Judge, for an order pursuant to Rule 65 of the
Federal Rules of Civil Procedure for a Preliminary Injunction enjoining Defendants during the
pendency of this action from commencing any work in furtherance of the Route 120 Bridge

Reconstruction Project, including site clearing activity, felling any trees or any other work in

connection with the Project in the hamlet of Chappaqua, Town of New Castle.

Dated: New York, New York
     August 19, 2008

 

James J. Periconi (JP-3184)
Delight D. Balducci (DB-6246)
PERICONI, LLC
708 Third Avenue, 17th Floor
New York, New York 10017
(212) 213-5500
*Attorney for the Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
CONCERNED CITIZENS OF CHAPPAQUA,
CHARLES NAPOLI, and GINA GORE,

              Plaintiffs,

               v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION (FEDERAL HIGHWAY
ADMINISTRATION), and the NEW YORK
STATE DEPARTMENT OF
TRANSPORTATION,

              Defendants.
-----------------------------------------------------------X

CIVIL ACTION

DOCKET NO.: _____


# PLAINTIFFS' MEMORANDUM IN SUPPORT OF
# A PRELIMINARY INJUNCTION AND
# TEMPORARY RESTRAINING ORDER


James J. Periconi (JP-3184)
Delight D. Balducci (DB-6246)
PERICONI, LLC
708 Third Avenue, 17th Floor
New York, New York 10017
(212) 213-5500
*Attorneys for the Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................ 1

BACKGROUND .......................................................................... 1

LAW ..................................................................................... 2

ARGUMENT ............................................................................. 3

A.  Plaintiffs' will be irreparably harmed if a TRO is not granted ........................... 3

B.  There is a likelihood of success of the merits of Plaintiffs' claim ...................... 5

    1.  The Project was Improperly Classified as a Categorical Exclusion ............ 6

    2.  The § 4(f) Evaluation of Alternatives was Inadequate ........................... 10

    3.  A Supplemental §4(f) Evaluation was required, but never conducted ......... 15

    4.  Defendants failed to re-evaluate the Project under § 106 of the National
        Historic Preservation Act ............................................................. 19

CONCLUSION ........................................................................... 20

## **TABLE OF AUTHORITIES**

### **CASES**

*Carpenter Technology Corp. v. City of Bridgeport*, 180 F.3d 93, 98 (2d Cir.1999) ....    3

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ........................    11-13

*Knowles v. United States Coast Guard*, 924 F.Supp. 593 (S.D.N.Y. 1996) .............    2, 3, 5

*Merritt Parkway Conservancy v. Norman Mineta*, 424 F.Supp.2d 396 (D.Conn. 2006) ...........................................................................    4, 11-13, 16

*Monroe County Conservation Council v. Volpe*, 472 F.2d 693 (2d Cir. 1972) .........    12

*Monroe County Conservation Council, Inc. v. Adams*, 566 F.2d 419 (citations omitted) ...........................................................................    12-13

*NAACP v. Town of East Haven*, 70 F.3d 219 (2d Cir. 1995) .............................    2

*New York v. Shinnecock Indian Nation*, 523 F.Supp.2d 185 (E.D.N.Y. 2007) .........    4

*Plaza Health Lab. Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989) ...................    3

*Sierra Club v. Block*, 1985 U.S. Dist. LEXIS 20670 (E.D.Tex. April 17, 1985) ......    4

*Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater*, 358 F.Supp.2d 83 (N.D.N.Y. 2005) ....................................................................    11, 12

*Tioronda, LLC v. State of New York*, 386 F.Supp.2d 324 (S.D.N.Y. 2005) .............    2-4

*U.S. v. 27.09 Acres of Land*, 760 F.Supp. 345 (S.D.N.Y. 1991) ..........................    2

## STATUTES

FED. R. CIV. P. 65 ……………………………………………………………….. 1, 5

5 U.S.C. § 706 ……………………………………………………………… 5

42 U.S.C. § 4321, *et seq.* ……………………………………………………… 2, 5

42 U.S.C. § 4322 …………………………………………………………… 6

49 U.S.C. § 303……………………………………………………………….. 6, 8, 11, 15

16 USCA § 470f, *et seq.* …………………………………………………….. 8, 19

## REGULATIONS

23 CFR Part 771.115 ……………………………………………………….. 7, 9

23 CFR Part 771.117 ……………………………………………………….. 6-9

23 CFR Part 771.135 ……………………………………………………….. 10-11, 16

## INTRODUCTION

Plaintiffs – a local citizens group and members who live and work in the immediate vicinity of this Project in one of Westchester County's storied towns – make this emergency application for a Temporary Restraining Order pursuant to FED. R. CIV. P. 65 to bar Defendants' site clearing in preparation for commencing an ill-conceived as well as illegal demolition and reconstruction of the Route 120 Bridge in the hamlet of Chappaqua, New York (the "Project")(the "Bridge"). Specifically, Plaintiffs ask this Court to temporarily restrain the chopping down or other destruction of any trees near the Bridge before the Court is able to hear and decide Plaintiffs' motion for a Preliminary Injunction, and so that Defendants are afforded the opportunity to oppose the motion.

Defendants' decision to tear down this National Register of Historic Places eligible, historic Bridge was made in gross disregard of three federal laws – the National Environmental Policy Act, the National Historic Preservation Act and the Department of Transportation Act – designed to insure that such decisions not be made casually, as happened here. Defendants improperly avoided preparing even an Environmental Assessment, much less an Environmental Impact Statement. With construction of the Project to begin soon thereafter, there is an imminent threat that numerous magnificent, irreplaceable 75-year old specimen trees, among others, in the area of the Bridge will be destroyed, beginning as soon as Tuesday, August 19, 2008, before this Court has had the opportunity to consider granting Plaintiffs' preliminary injunction pending a trial on their claims.

## BACKGROUND

At the request of the Town of New Castle, Defendants have improvidently declined to repair and rehabilitate a National Register of Historic Places eligible 1930 bridge in Chappaqua

despite the fact that it is both "prudent and feasible" to do so. Defendants have failed to overcome the significant hurdles that Congress erected and the courts within the Second Circuit (as elsewhere) have staunchly upheld repeatedly.

As the Complaint also served and filed today more fully details, Defendants arbitrarily and capriciously classified this Project as a "Categorical Exclusion," thus not warranting substantive environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, although no reading of the relevant federal regulations allows such a classification on these facts. In addition, Defendants also decided that repair and rehabilitation of the bridge was not a "prudent and feasible" alternative to demolition of a protected historic resource and reconstruction in an arbitrary and capricious manner, in that nothing in the record does or even could support such a determination.

## LAW

A Temporary Restraining Order ("TRO") must be granted if movants show:

    (1)    they will suffer possible irreparable harm if the TRO is not granted; and

    (2)    there is a likelihood of success on the merits of their claim.

*See Tioronda, LLC v. State of New York*, 386 F.Supp.2d 324, 349-350 (S.D.N.Y. 2005); *Knowles v. United States Coast Guard*, 924 F.Supp. 593, 602 (S.D.N.Y. 1996) (citing *NAACP v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995)); *U.S. v. 27.09 Acres of Land*, 760 F.Supp. 345, 354 (S.D.N.Y. 1991).

Irreparable harm is an injury that "'is likely and imminent, not remote and speculative, and that…is not capable of being fully remedied by money damages.'" *Knowles*, 924 F.Supp., at 602 (citing *Town of East Haven*, 70 F.3d, at 224). As explained more fully hereafter, the felling of mature trees is classic irreparable injury.

With respect to the second prong of this test, when a party "seeks to enjoin governmental action 'taken in the public interest pursuant to a statutory or regulatory scheme,'" it must establish a likelihood that it will succeed on the merits of its claim. *Knowles*, 924 F.Supp., at 602 (quoting *Plaza Health Lab. Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)); see also *Carpenter Technology Corp. v. City of Bridgeport*, 180 F.3d 93, 98 (2d Cir. 1999); *Tioranda*, 386 F.Supp.2d, at 349. As Plaintiffs are confident they can demonstrate a likelihood of success on the merits, they adopt this more stringent test.

## ARGUMENT

### A.    Plaintiffs will be irreparably harmed if a TRO is not granted.

If this Court does not issue a TRO, the Plaintiffs will suffer irreparable harm in that sixty-one trees, about half of which include magnificent and irreplaceable specimen oak trees and sycamore trees, among other healthy, attractive trees, will be cut down to accommodate an expanded bridge, including approaches. *See* Affidavit of certified arborist Peter Bartlett, sworn to on August 16, 2008, and submitted herewith in support ("Bartlett Aff.").

The oaks and sycamores range between fifty and seventy feet in height. Bartlett Aff. These trees are in the pathway of destruction and will need to be cleared in order for the Defendants to commence construction work on the Bridge. Complaint, ¶ 56. These oak and sycamore trees, among others, located downtown near the Bridge and adjacent to Depot Plaza and the Chappaqua Train Station – two National Historic Register of Places – beautify the hamlet of Chappaqua, as the photos, attached as Exh. I to Affidavit of Charles Napoli, sworn to on August 18, 2008 ("Napoli Aff.") demonstrate. The Town's own "renewed community vision for . . .downtown [Chappaqua]" was drawn in part from a report prepared by the Project for

Public Spaces, Inc., in June 2007, which reflected the citizenry's extolling "green," "attractive," "historic" and "sheltering" aspects of the existing downtown.[1]

The felling of trees unquestionably and canonically constitutes irreparable injury warranting a restraining order until a preliminary injunction motion can be heard and decided. *See Tioronda*, 386 F.Supp.2d, at 350 ("[P]ermanent damage to rare and horticulturally significant trees is irreparable harm that is sufficient to warrant relief on a preliminary injunction motion."); *New York v. Shinnecock Indian Nation,* 523 F.Supp.2d 185, 301 (E.D.N.Y. 2007) ("the anticipated construction and operation of the casino will have a detrimental environmental impact, some of which is essentially irreversible, such as the destruction of trees"); *Merritt Parkway Conservancy v. Norman Mineta*, 424 F.Supp.2d 396, 426 (D.Conn. 2006) ("the next stage of construction will cause irreparable harm, including the felling of mature trees" ... "[The] project will work a major and likely irreversible change to the landscape of the Merritt Parkway. Thus, if these aspects of the construction process go forward, the status quo will be destroyed."); *Sierra Club v. Block*, 1985 U.S. Dist. LEXIS 20670, *8 (E.D.Tex. April 17, 1985) ("the Court will presume that the loss of a significant number of trees constitutes an irreparable harm, at least to the extent that decades are required to replace the last trees and their accompanying undergrowth."). Sixty-one trees is a "significant number". It will take decades to replace meaningful irreplaceable trees of upwards of seventy-five years in age. Money alone, by definition, cannot purchase mature trees that provide an enormous amount of shade, a sense of peace and tranquility, and an historic "rootedness" in the community that Horace Greeley, one of this country's most famous 19th century figures made prominent when it became his weekend home in 1854 . Napoli Aff., at Exh. A.

---

[1] www.town.new-castle.ny.us/PPS%20REPORT%20.%20JUNE%202007.pdf

Defendant NYSDOT advises that removal of these trees will commence on or around August 19 or 20, 2008. Complaint, ¶ 60; Affidavit of James J. Periconi, Esq., sworn on August 18, 2008 ("Periconi Aff."), ¶ 5, and Exh. B thereto. In fact, construction clearing began the morning of August 15, 2008. Napoli Aff., ¶ 2. Defendants have only agreed not to do anything other than "site clearance for surveying purposes" before close of business on August 18, 2008.

While it appears that none of the oak or sycamore trees – some of them specimen trees, Bartlett Aff.– has yet been touched, Defendants will commence the felling of the oak and sycamore trees immediately, and before this Court can hear and decide Plaintiffs' motion for a Preliminary Injunction. A TRO is necessary to allow this Court time for a hearing on Plaintiffs' motion for a Preliminary Injunction and to render a decision thereon, and to protect the mature oak and sycamore trees and other trees, from unnecessary destruction pending such a decision.

If this Court does not issue a Preliminary Injunction, Plaintiffs will suffer imminent irreparable harm in that they will lose their ability to enjoy these trees, exactly the harm that the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and FED. R. CIV. P. 65 - were designed to protect against. *See Knowles*, 924 F.Supp., at 603.

**B.    There is a likelihood of success of the merits of Plaintiffs' claim.**

In addition to the irreparable injury shown above, Plaintiffs are likely to succeed on their claim that the Defendants failed to follow the procedures mandated for "major federal actions" in the NEPA regulations promulgated thereunder, and the Department of Transportation Act ("DOT Act"), 49 U.S.C. § 303, even under the arbitrary and capricious standard that a court reviewing the Defendants' actions would employ. 5 U.S.C. § 706. As alleged in Plaintiffs' complaint, and discussed below, Defendants improperly categorized this massive Project as a "Categorical Exclusion" during its review pursuant to NEPA. Thus, the Defendants failed to perform a

required Environmental Assessment ("EA") before approving the Project. The Defendants further failed to properly evaluate whether retention and rehabilitation of the historic bridge was a "prudent and feasible" alternative to the proposed Project during the § 4(f) Evaluation under the Department of Transportation Act ("DOTA"), 49 U.S.C. § 303. Moreover, even if their cursory review constituted at § 4(f) evaluation, that review clearly needed supplementation when it expanded from a $2.5 / $3.5 million rehabilitation to a $17,844,871 replacement (including the intersection of Hunts Lane (on the other side of the Metro North tracks)). This replacement also includes expansion of the retaining wall for the bridge and approaches increasing an order of magnitude from 25 feet to 292 feet.

1.    *The Project was Improperly Classified as a Categorical Exclusion*

NEPA requires that every "major federal action" significantly affecting the quality of the human environment (including those actions that have an impact on historical properties and resources) undergo an environmental review process before approval by a federal agency, in this case, the NYSDOT acting under the auspices of the FHWA, and before expenditure of federal monies. 42 U.S.C. § 4332(c). Here, FHWA's regulations, 23 CFR Part 771.117, promulgated under NEPA, govern the determination of the type of environmental review a proposed transportation project will need to undergo.

Under the FHWA regulations, every proposed federal action is first classified as one of the following: Class I (requiring a full Environmental Impact Statement ("EIS")), Class II (Categorical Exclusions ("CE") actions that do *not* require preparation of an EIS or even an Environmental Assessment ("EA")), or Class III (actions that are classified as neither Class I nor Class II, and that require an EA to determine their appropriate classification). 23 CFR Part 771.115.

6

The NYSDOT's Final Design Report issued in October 2006 (Exh. F. to Napoli Aff.) incorrectly classified this action as a Class II (CE) action and exempted the project from *any* environmental review. In fact, it appears that the project was designated a Class II action even earlier than that report, well before it was clear whether a modest rehabilitation or a complete replacement would be necessary. The December 2, 2005 Section 106 National Historic Preservation Act Finding Documentation NYSDOT prepared, Exh. C to Napoli Aff., notes that the project is being "progressed" as a NEPA Class II action.

However, the proposed project simply does not meet the definition of a CE under the FHWA regulations, found at 23 CFR Part 771.117. "Categorical Exclusions" are defined as "actions which: do not induce significant impacts on any natural, cultural, recreational, historic or other resource." 23 CFR § 771.117(a). Here, however, the State Historic Preservation Office ("SHPO") had clearly declared that "replacement of the Route 120 Bridge will result in an Adverse Effect upon the property." *See* SHPO letter to NYSDOT, dated December 15, 2005, annexed to the Napoli Aff. as Exh. D. Indeed, NYSDOT and FHWA also acknowledge that the project would have an adverse impact on a National Register of Historic Places eligible Bridge. *See* Memorandum of Agreement among FHWA, SHPO and NYDOT, dated August 16, 2006, annexed to Napoli Aff. as Exhibit G. Therefore, the project clearly does not qualify as a CE under the § 771.117(a) regulation. SHPO agreed in that document to permit the bridge to be replaced by a new one, so long as architectural details of the existing bridge were to be "mimic[ed]" by the new bridge. But that August 2006 approval was clearly based on the erroneous belief promoted by NYSDOT only two months prior that the new retaining wall for the bridge and approaches would be 25 feet, exactly as existed. Exh. E to Napoli Aff. As soon

7

as it became apparent, but too late, in the Final Design Report (Oct. 2006), a far lengthier the retaining wall was planned.

Even if the proposed project met the definition of a CE, it would be exempted from such a classification under Part 771.117(b). That subpart states:

> Any action which normally would be classified as a CE but <u>could</u> involve unusual circumstances will require the Administration, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper.

23 CFR § 771.117(b) (emphasis added). This subpart further provides that one such "unusual circumstance" is "significant impacts on properties protected by Section "4(f)" of DOT Act [now found at 49 U.S.C. § 303 (2005)] and 106 of National Historic Preservation Act [16 U.S.C. § 470f (West 2005)]." 23 CFR § 771.117(b)(3). This special circumstance is present here, as: (1) the Bridge itself is National Register of Historic Places eligible;[2] and (2) the Bridge is in close proximity to and of a piece with the Chappaqua Train Station and Depot Plaza, both of which are on the National Register of Historic Places.

Accordingly, if the Defendants wanted to classify the Project as a CE, they were required to conduct an appropriate environmental study to determine if the CE classification is proper. This study was never conducted and, therefore, the Defendants prematurely and improperly classified the Project as a CE.

The project also does not qualify as a CE because it is not included on the list of actions that are set forth in Part 771.117(c) as Class II CE activities. *See* 23 CFR § 771.117(c).

Finally, the Project cannot be considered a CE under 23 CFR Part 771.117(d). Under a separate list of actions contained in § 771.117(d), which includes bridge reconstruction projects,

---

[2] National Historic Register "eligible" properties are those that have been determined eligible under 36 CFR Part 63 or otherwise meet National Historic Register criteria, thus receiving protection.

the Project may meet the criteria for CE status "only after Administration approval" upon

submission by the applicant of "documentation which demonstrates that the specific conditions

or criteria for these CEs are satisfied and that significant environmental effects will not result."

23 CFR § 771.117(d).

As noted in the Final Design Report, dated October 2006, and by regulation, the Project

falls under two § 771.117(d) categories: (1) modernization of a highway by...reconstruction...or

adding auxiliary lanes; and (2) bridge reconstruction. *See* Final Design Report, Exh. F to Napoli

Aff., at IV-2. The Report states that the agency has made a <u>preliminary</u> determination that the

project meets the requirements of a Categorical Exclusion with documentation in accordance

with 23 CFR Part 771.117(a) and (d). *See id.*

However, Appendix F of the Final Design Report, titled NEPA Checklist, contains the

following question:

> 23.  "Is the project listed in 23 CFR 771.117(d) (D list) or is the
>       project an action similar to those listed in 23 CFR
>       §771.117(d)?"

In fact, question no. 23 was left unanswered, when it should have been answered "yes"

because the NYSDOT acknowledged in the body of the Final Design Report that the Project

qualifies as a D list project. *See* Final Design Report, at Appendix F. D-list projects require

documentation, as noted. 23 CFR § 771.117(d). As applicant NYSDOT should thus have

submitted the required documentation.

Despite the fact that a November 1, 2006 letter from Defendant USDOT (FHWA) to

Defendant NYSDOT approves the Project as a CE (Exh. G to Napoli Aff. and Appendix G of

Exh. F to Napoli Aff.), this approval is without support in the record, given the incomplete

NEPA checklist and the apparent failure of NYSDOT to submit documentation in accordance with 23 CFR § 771.117(d).

Therefore, it is clear that the Project does not either automatically or otherwise qualify as a Class II (CE) action; rather, it requires environmental studies under 771.117(b), and thus FHWA's approval of the project as a CE without supporting documentation was improper.

Because the Defendants improperly categorized the Project as a CE, they therefore failed to perform an EA. Any reasonable preliminary environmental studies of the project would lead to preparation of an EA, where that project increases a minor (25 foot) retaining wall to a 292 foot retaining wall that will utterly overpower whatever architectural details are mimicked from the historic bridge to a 21st century one. The FHWA regulations state that an Environmental Assessment (EA) is required when the proposed action is an "action in which the significance of the environmental impact is not clearly established." These are actions that do not fall under the Class I actions set forth in § 771.115(a) or the Class II actions (CEs) discussed above. Since the proposed project did not clearly qualify as a CE, an EA was warranted and, indeed, mandatory.

2.   *The § 4(f) Evaluation of Alternatives was Inadequate*

The Plaintiffs' claims also have a likelihood of succeeding because Defendants' required "Section 4(f) Evaluation" under the DOT Act was completely inadequate. Before NYSDOT can approve the Project, it was required to undertake a DOT Act § 4(f) Evaluation, as it must for any transportation project that will use resources that are on, or eligible for, the National Register of Historic Places, such as the Route 120 Bridge here.

Defendants made no record whatever of why NYSDOT performed a § 4(f) Evaluation with the Final Design Report (Napoli Aff., Exh. F) in October, 2006. *See* 23 CFR Part 771.135(e). The purpose of this evaluation was to minimize harm to historic properties by

allowing a Project to proceed that "uses" an historic resource *only* if there is no "prudent and feasible alternative". *See Merritt Parkway*, 424 F.Supp.2d, at 417.

The relevant statute provides in pertinent part:

§ 303. Policy on lands, wildlife and waterfowl refuges, and historic sites.

(c) Approval of programs and projects. Subject to subsection (d), the Secretary may approve a transportation project (other than any project for a road or parkway under section 204 of title 23) requiring the use of ... land of an historic site of national, State or local significance (as determined by the Federal, State, or local officials having jurisdiction over the ... site) only if –

(1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the ... historic site resulting from [its] use.

*See* 49 U.S.C.A. § 303(c) (West, 2005). This section, in essence, requires "FHWA to consider alternatives that result in a less-drastic use of a Section 4(f) resource." *See Merritt Parkway*, 424 F.Supp.2d, at 417. FHWA can only justify the use of the historic property if there is no other prudent and feasible alternative. 49 U.S.C. § 303(c).

The Supreme Court has held that, in this context, "feasible" means that the agency "must find that as a matter of sound engineering it would not be feasible to build the highway along any other route." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411 (1971); *Stewart Park and Reserve Coalition, Inc. (SPARC) v. Slater,* 358 F.Supp.2d 83, 94 (N.D.N.Y. 2005). In terms of whether there is no "prudent" alternative to the use of a protected resource (parkland in the *Overton Park* case and historic sites, here), factor of cost, directness of route and community disruption are not on equal footing with the need to preserve parkland (and historic sites). *Overton Park*, 401 U.S., at 411-412.

11

Only if the cost or community disruption of an alterative to using a protected resource would reach "extraordinary magnitudes" will the use of that resource be allowed, keeping in mind that there must be all possible planning to minimize harm to the resource. *SPARC*, 358 F.Supp.2d, at 94-95; see also *Monroe County Conservation Council v. Volpe*, 472 F.2d 693, 700 (2d Cir. 1972) ("a prudent alternative route is one that does not present unique problems, that is, an alternative without truly unusual factors so that the cost or community disruption would reach extraordinary magnitudes"). Here, the Defendants' § 4(f) Evaluation, as set forth in the 2006 Final Design Report, is only a cursory consideration of the relevant factors.

The Section 4(f) Evaluation set forth in the October 2006 Final Design Report only considers three alternatives: (1) do nothing; (2) build a new structure at a different location; and (3) rehabilitate the historic bridge. The first two alternatives were dismissed, and the third alternative – instead of considering the various aspects of rehabilitation – was simply a justification for rebuilding the bridge: NYSDOT cited that the new bridge needs to be wider than the existing bridge (to accommodate a third lane), the rehabilitation will cost $3.5 million versus the then belief that a completely new bridge would cost only $5 million to rebuild (the numbers in this report are no longer accurate as the successful bid was around $17 million). Thus, the conclusion that it was more cost effective to rebuild from scratch a bridge with a longer life span without further repair, rather than repair the old one, was erroneous.

"Although FHWA need not have considered in detail each and every conceivable variation of the alternatives stated, FHWA must set forth alternatives sufficiently to permit a reasoned choice." *Merritt Parkway*, 424 F.Supp.2d, at 418 (citing *Monroe County Conservation Council, Inc. v. Adams*, 566 F.2d 419, 425 [2d Cir.] (citations omitted)). The § 4(f) Evaluation did not weigh and compare the impacts on the historic property of the rehabilitation alternative

rather than a rebuild alternative, and did not discuss how the impacts could be mitigated though implementation of variations of those two alternatives. *See Merritt Parkway*, 424 F.Supp.2d, at 419. Further, the Evaluation did not consider alternate ways of reconstructing the Bridge that would minimize harm to it. *See id.*, at 420. There is no discussion of how a massive retaining wall on one side of the bridge would utterly overpower whatever values a completely new bridge with "mimicked" architectural details would have. Napoli Aff., ¶ 6. Therefore, NYSDOT's conclusion (and FHWA's concurrence) that there were no "prudent and feasible" alternatives to the use of the historic bridge was utterly arbitrary and capricious.

The October 2006 Final Design Report itself seemingly considers five alternatives; three of those alternatives – the reconstruction alternatives – are essentially the same (the other two alternatives being no action and rehabilitation). All three variations of Alternative 3 propose reconstructing the bridge with three lanes. The only differences among these alternatives are that the offset of the centerlines varies slightly, as well as the time allotted for construction. The other two alternatives are "rehabilitation" and "no action".

The "rehabilitation" alternative was given only a cursory review in the October 2006 Final Design Report. At $3.5 million, the "rehabilitation" alternative was considered a little more than 50% of the supposed cost[3] of the "bridge replacement alternative." No criteria other than the prohibited more than 65% rule were applied, and even that one may have been improperly applied.[4] There is no suggestion in the record that the costs of rehabilitating the bridge are disproportionately high and unreasonable. *See Overton Park*, 401 U.S., at 411-412. The

---

[3] Plaintiffs understand that actual approved and approvable bids for this work are far more than two times $3.5 million.
[4] The 65% rule states that reconstruction should be done if the cost of rehabilitation is more than 65% than the cost of reconstruction.

Defendants acted arbitrarily and capriciously in failing to more fully consider rehabilitation alternative before determining that the bridge needs to be completely replaced.

The October 2006 Final Design Report also repeatedly notes the need to maintain two lanes of traffic during construction to avoid lane closures. Indeed, this requirement is one of the reasons the § 4(f) Evaluation rejected the rehabilitation alternative. That evaluation, contained in the October 2006 Final Design Report, states:

> During construction, two-way traffic will need to be maintained at all times. The existing bridge section is not wide enough to accommodate two-way traffic without modifying and widening the existing structure. These modifications to the existing bridge would have a significant adverse effect on the character of the existing historic bridge.

Final Design Report, October 2006, at V-3.

However, it is clear from the discussion at a Town board meeting with the NYSDOT on June 24, 2008 that, not only was the third lane not really necessary because it will not eliminate lane closures during construction, but the public was also misinformed about lane closures resulting from the reconstruction. Napoli Aff., ¶ 40. In fact, if lane closures were an inevitable part of the construction process, NYSDOT could have chosen the rehabilitation alternative without worrying about modifying and widening the existing bridge.

Importantly, the rebuild alternative requires the destruction of upwards of sixty-one mature trees in the vicinity of the Bridge, whereas the trees would remain in place under the rehabilitation alternative.

Moreover, Defendants cannot argue that the reconstruction of the Bridge will result in only a *de minimis* impact on the protected property. The destruction of an historic bridge that can be rehabilitated is certainly not a *de minimis* impact! The DOT Act provides that the § 4(f) requirements will be satisfied if the FHWA determines the project will have a *de minimis* impact

on the area. *See* 49 U.S.C. § 303(d). For historical sites, the agency may make a finding of *de minimis* impacts only if:

> (A)  the Secretary has determined, in accordance with the consultation process required under section 106 of the Nation Historic Preservation Act (16 U.S.C. 470f), that –
>
> > (i)  the transportation program or project will have no adverse effect on the historic site; or
> >
> > (ii)  there will be no historic properties affected by the transportation program or project;
>
> (B)  the finding of the Secretary has received written concurrence from the applicable State historic preservation officer or tribal historic preservation officer (and from the Advisor Council on Historic Preservation if the Council is participating in the consultation process); and
>
> (C)  the finding of the Secretary has been developed in consultation with parties consulting as part of the process referred to in subparagraph (A).

*See* 49 U.S.C.A. § 303(d)(2) (West 2005).

The Defendants have not and cannot meet these requirements because the destruction of the National Register of Historic Places eligible bridge does not constitute a *de minimis* impact, and defendants found as much. Exh. G to Napoli Aff. Accordingly, Defendants acted arbitrarily and capriciously in approving this Project on the basis of an inadequate § 4(f) Evaluation.

3.    *A Supplemental §4(f) Evaluation was required, but never conducted*

Even if the § 4(f) Evaluation had been adequate, which is not the case, the Defendants failed to supplement the § 4(f) Evaluation after there were significant changes made to the design of the bridge reconstruction in June 2007 and later.

The FHWA regulations require that a separate § 4(f) Evaluation be undertaken when a proposed "modification of the design or measures to minimize harm would result in a substantial increase in the amount of § 4(f) land used, a substantial increase in the adverse impacts to the §

15

4(f) land, or a substantial reduction in mitigation measures." 23 CFR Part 771.135(m)(3);

*Merritt Parkway*, 424 F.Supp.2d, at 421 ("FHWA regulations permit a preliminary 4(f)

determination … [,b]ut the right to rely on a preliminary analysis entails a corresponding duty

(reflected in the FHWA's own regulations) to revisit the evaluation once the missing information

becomes available.").

The design of the project was uncertain until June 2007, well after the October 2006 §

4(f) Evaluation.  Indeed, the project design and scope changed substantially between the time of

the October 2006 Final Design Report and the design was finalized before going out to bid in

October 2007, from a 146 foot retaining wall in the Final Design Report to the 265 foot wall

described in the construction documents. Exh. H to Napoli Aff.  Therefore, Defendants acted

arbitrarily and capriciously in failing to perform a supplemental §4(f) Evaluation.

In the October 2006 Final Design Report, the existing two lanes were to be replaced and

an additional lane added as a "bump out" from the southern lane to accommodate two lanes of

traffic during construction, which would eventually become the third lane.[5]  With respect to the

remainder of Route 120 west of the bridge, the October 2006 final design report notes, "[t]he

only change in lane configuration would include a right hand 'slip ramp' from Quaker Street

westbound onto Hunts Place." October 2006 Final Design Report, Exh. H to Napoli Aff., at III-

6. In other words, the "bump out" lane had been intended to provide only a temporary solution

during the construction phase.

At a public meeting on June 12, 2007, the Town Administrator announced that NYSDOT

had given the Town only ten days from that date in which to approve a greatly expanded plan,

with a permanent third lane and a 264 foot retaining wall.  Only then did it become clear that

---

[5] According to the 2005 § 106 Report, the third lane would only require widening the bridge by 10 feet. The
October 2007 final design, however, shows that the bridge widening would actually be 18.2 feet.

16

scores of trees would be cut down. The public had no access to these proposed final plans during that ten day period. Although the Project plan included the "bump out" from the south travel lane early on, the Town only decided in its June 19, 2007 work session (eight months after the § 4(f) Evaluation in the October 2006 Final Design Report) -- within the ten day approval period given by NYSDOT - that the "bump out" would, instead, become a complete and permanent third lane spanning the entire length of the bridge and adding another lane of traffic entering the hamlet. As noted above, at the time of the § 4(f) evaluation, there were still only two lanes on the bridge itself. The revisions to the design plan to accommodate the additional travel lane going into the hamlet were not made until after the June 19, 2007 work session, which was long after the project had already undergone § 106 and § 4(f) reviews.

The consequence of finalizing the plan for the third lane in June 2007 is that the project had to be modified to provide for an additional, permanent travel lane to come into the hamlet. These revisions include changing the length of the retaining wall.

The § 106 Findings Documentation prepared in December 2005 notes that the length of the retaining wall needed to support this third lane would only be 25 feet extending east of the bridge.[6] The June 2, 2006 NYSDOT letter to SHPO attached a conceptual drawing showing only a 25 foot retaining wall. The August, 2006, signoff by SHPO was based on this misinformation. Based on drawings that accompany the October 2006 Final Design Report, it became clear that Defendants planned to extend the retaining wall further toward to the hamlet to 164 feet. Finally, it was not until June 2007 that the final plan to build the retaining wall to extend out 264 feet was revealed. This is a significant change with a substantial impact because this new design will eliminate all existing trees as well as the grassy approach ramp leading to

---

[6] There is no reference in the October 2006 Final Design Report to the retaining wall and how long it will need to be.

the hamlet. The loss of 61 trees, as well as the overpowering retaining wall, would cause irreparable injury to the sense that residents of Chappaqua have of their hamlet. Moreover, the historical significance of what was called, at opening day ceremony in 1930, the most beautiful bridge in New York State.

The Historic American Engineering Record (Level II Documentation) of the Route 120 Bridge from the New York State Museum records explains the aspects of this bridge that make it historically special and unique:

> Contributing elements consist of the intact stone abutments, wing walls, buttress walls, parapet walls, stairways, and corner columns, and steel railings.

Exh. A to Napoli Aff. Defendants have not guaranteed in documents available for public review that the new retaining wall will retain the special characteristics of the wing walls and buttress walls described above. It is clear, however, that, if the Bridge is reconstructed – rather than rehabilitated, Defendants will not be able to preserve the sixty-one trees leading up to the Bridge from downtown Chappaqua.

Additionally, the new third lane will clearly change traffic patterns in the hamlet because the other travel lanes will have to be re-aligned to accommodate the new lane. Vehicles crossing the bridge into town will no longer be allowed to make a sharp right turn into the parking lot off of South Greeley Avenue. Instead, all vehicles wanting to access that area will have to continue straight on South Greeley Avenue, leading to increased traffic near the school crossing. There have been no traffic studies since 2000 (before the plan was developed to rebuild the bridge to replace two lanes with three lanes) with regard to the hamlet's intersections and traffic flow. Instead, the Town has its fingers crossed, in effect, that the additional lane of traffic coming into the Village will somehow result in "hopefully reduced backup"; the extra lane "should help ease

18

the morning traffic flow." *See* Town Supervisor's Report, dated February 8, 2008, at

http://www.town.new-castle.ny.us/120%20Bridge%20Update.pdf (8/17/08). Such "hopes"

should not guide public officials.

The addition of a complete third lane of traffic into the hamlet is exactly the type of

change that falls under 23 CFR § 771.135(m)(3), and thus that requires a supplemental § 4(f)

evaluation.

Accordingly, it is clear that Defendants acted arbitrarily and capriciously in failing to

supplement the § 4(f) Evaluation, and that there is a likelihood that Plaintiffs will succeed in

their claims seeking a re-evaluation of the proposed Project under NEPA, DOT Act and the

National Historic Preservation Act.

4.    *Defendants failed to re-evaluate the Project under § 106 of the National Historic Preservation Act*

Defendants should have – but did not – undertake a re-evaluation of the Project after the

Project morphed from the plans set forth in the original § 106 Findings Documentation from

2005 (in which the new bridge and its approach, present a retaining wall of 25 feet, essentially

the same size as the existing Bridge) to the current design revealed in its entirety in the October

2007 contractor bid documents (Exh. H to Napoli Aff.), where the planned bridge is significantly

larger than the current Bridge, and the retaining wall an order of magnitude large than when

SHPO signed off on the project in August 2006.

The National Historic Preservation Act (NHPA), 16 U.S.C. § 470 *et seq.*, requires any

federal agency that has jurisdiction over a proposed federally assisted undertaking in any State –

here, FHWA – to take into account the effect of the undertaking on any site or structure that is

eligible for inclusion in the National Register of Historic Places. Additionally, the federal

agency must "afford the Advisory Council on Historic Preservation (ACHP) a reasonable

19

opportunity to comment with regard to such undertaking." Here, while the Defendants initially allowed the ACHP to comment on this undertaking, the Defendants should have alerted the ACHP to review the revised design plans.

In the Section 4(f) Evaluation included in the October 2006 Final Design Report, NYSDOT references a February 9, 2006 letter from the ACHP which stated that its "consultation to resolve the Adverse Effect was not needed after reviewing the Finding Documentation Report." Importantly, the Finding Documentation Report is the Section 106 Report prepared in December 2005, when the design of the new bridge and its approach was essentially the same size as the current Bridge. Accordingly, Defendants acted arbitrarily and capriciously in not notifying the ACHP of the substantial changes to the project and providing them with an opportunity to comment on the revised plan.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant a TRO restraining Defendants and their agents from chopping down or otherwise harming or destroying any of the trees near the Route 120 Bridge in Chappaqua.

Respectfully submitted,

James J. Periconi (JP-3184)
Delight D. Balducci (DB-6246)
PERICONI, LLC
708 Third Avenue, 17th Floor
New York, New York 10017
(212) 213-5500
*Attorneys for the Plaintiffs*

James J. Periconi
Delight D. Balducci
PERICONI, LLC
708 Third Avenue, 17th Floor
New York, New York 10017
(212) 213-5500
*Attorney for the Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
CONCERNED CITIZENS OF CHAPPAQUA,
CHARLES NAPOLI, and GINA GORE,

|                          |                    |
|--------------------------|--------------------|
| Plaintiffs,              | CIVIL ACTION       |
|                          | DOCKET NO.:        |
| -against-                |                    |
|                          |                    |
| UNITED STATES DEPARTMENT OF TRANSPORTATION (FEDERAL HIGHWAY ADMINISTRATION) and NEW YORK STATE DEPARTMENT OF TRANSPORTATION, | **AFFIDAVIT** |
|                          |                    |
| Defendants.              |                    |

-------------------------------------------------------X

JAMES J. PERICONI, being duly sworn, deposes and states:

1.       I am the principal of Periconi, LLC, counsel to Plaintiffs Concerned Citizens of Chappaqua, Charles Napoli and Gina Gore in the above captioned matter. I submit this affidavit in support of Plaintiffs' motion for a preliminary injunction, and for an order temporarily restraining Defendants from site clearance work or any other steps in furtherance of their plan to demolish the historic Route 120 bridge.

2.       On behalf of Plaintiffs, on June 25, 2008, we wrote to Defendant the New York State Department of Transportation, copying the letter to Defendant U.S. Department of Transportation's Federal Highway Administration's Regional Engineer, to describe the deficiencies in the process by which a new, replacement, expanded Route

120 bridge was approved by Defendants. A copy of that letter is attached hereto as Exhibit A.

3.      In response, Keith Martin, Esq., counsel for NYSDOT, e-mailed me; we exchanged several preliminary e-mails and phone conversations.

4.      On August 8, Mr. Martin expressed to me NYSDOT's conclusion, concurred in by FHWA, that there was no reason for those agencies to reconsider their decision to approve the bridge project.

5.      On August 13, I wrote to Mr. Martin to confirm our conversation, namely, "no errors or omissions were made by them in the review process, and the project will go forward as scheduled, beginning with site clearance, starting [approximately] August 20, 2008." Mr. Martin actually said "late August," and said by e-mail that that meant "August 20," but in fact made no representation that site clearance would not start before that date. A copy of that letter is attached hereto as Exhibit B.

6.      On August 15, Mr. Martin wrote to me. A copy of that letter is attached hereto as Exhibit C.

7.      On that same date, based on affiant Charles Napoli's informing me of the commencement of site clearance work, I spoke with Mr. Martin, and informed him that we would seek a restraining order on Monday, August 18, 2008. I then wrote to Mr. Martin to confirm this; I tried to fax the same letter to Kenneth Dymond, Mr. Martin's counterpart at FHWA in Albany, but was unsuccessful; I called Mr. Dymond at about

5:15 p.m. and left a voicemail message of our intent to seek a restraining order on August 18 at the federal courthouse at White Plains. This morning, August 18, I successfully faxed the letter to Mr. Dymond at 7:20 a.m. A copy of the letter to Messrs. Martin and Dymond is attached as Exhibit D.

JAMES J. PERICONI

Sworn to before me this
18th day of August, 2008

Jessica Robles
Notary Public

JESSICA G. ROBLES
NOTARY PUBLIC-STATE OF NEW YORK
No. 01RO6152401
Qualified in New York County
My Commission Expires September 11, 20_10

# EXHIBIT A



PERICONI, LLC
708 THIRD AVENUE
NEW YORK, NEW YORK 10017

TEL 212•213•5500
FAX 212•213•5030
jpericoni@periconi.com
www.periconi.com

June 25, 2008

**VIA FACSIMILE AND
FIRST CLASS MAIL**

William Gorton, P.E.
Regional Design Engineer
New York State Department of Transportation, Region 8
4 Burnett Boulevard
Poughkeepsie, New York 12603

### Re:     Route 120 Bridge Reconstruction, Chappaqua, New York

Dear Mr. Gorton:

This firm represents the Concerned Citizens of Chappaqua ("Concerned Citizens"), a
citizen-directed organization dedicated to enhancement and preservation of the small town feel
of the hamlet of Chappaqua. Concerned Citizens opposes the demolition, replacement and
widening of the historic Quaker Street Bridge (the Route 120 Bridge or the "Bridge"), which
would be detrimental to the hamlet's unique way of life, because the decision to destroy rather
than repair the existing bridge has been made in violation of federal law.

After review of the relevant facts concerning the Bridge reconstruction project, related
reports and town meeting minutes, we have determined that the New York State Department of
Transportation ("NYSDOT") and the Federal Highway Administration ("FHWA") have failed to
comply with the requirements of the National Environmental Policy Act ("NEPA"), as codified
at 40 CFR Part 1500 et seq. and 23 CFR Part 771, and must therefore undertake a fresh
examination of the problem in compliance with NEPA.

As discussed more fully hereinafter, the proposed project was initially improperly
classified in 2006 as a Categorical Exclusion and, therefore, never underwent proper
environmental review. Additionally, 23 CFR § 771.117(b) requires the FHWA, which is part of
the U.S. Department of Transportation ("DOT"), and the "applicant," if different, to conduct
environmental studies because the bridge is National Historic Register eligible. Here, the
"applicant" is NYSDOT. These studies – separate from the requirements to review projects
involving National Historic Register eligible properties under the DOT Act § 4(f) and the
National Historic Preservation Act § 106 – were never undertaken.

William Gorton, P.E.
June 25, 2008
Page 2

Additionally, although the NYSDOT seemingly completed a § 4(f) review in October
2006, it was obligated to supplement this report after there were significant changes to the design
of the Bridge reconstruction in June 2007. In complete violation of 23 CFR § 771.135(m), no
such supplement was prepared. Moreover, it does not appear that the NYSDOT analyzed all
prudent and feasible alternatives at any time during its § 4(f) evaluation. Therefore, the decision
to approve this project was improper and should be reversed before any demolition work begins.

## The Project was Improperly Classified as a Categorical Exclusion.

As you are aware, NEPA requires that every "major federal action" significantly
affecting the quality of the human environment (including those actions that have an impact on
historical properties and resources) undergo an environmental review process before approval by
a federal agency, in this case, the NYSDOT acting on behalf of DOT and the FHWA, and before
expenditure of federal monies. The Council on Environmental Quality's (CEQ) and, here,
FHWA's regulations govern the determination of the type of environmental review a proposed
project will need to undergo.

Under the FHWA regulations, every proposed federal action is first classified as one of
the following: Class I (requiring a full Environmental Impact Statement), Class II (Categorical
Exclusions ("CE") actions that do not require preparation of an EIS or even an Environmental
Assessment (EA)), or Class III (actions that are classified as neither Class I nor Class II, and that
require an EA).

The DOT's Final Design Report issued in October 2006 incorrectly classified this action
as a Class II (CE) action and exempted the project from any environmental review. In fact, it
appears that the project was designated a Class II action earlier than that report. The December 2,
2005 Section 106 National Historic Preservation Act Finding Documentation your office
prepared notes that the project is being "progressed" as a NEPA Class II action. However, the
proposed project simply does not meet the definition of a CE under the FHWA regulations.

CEs are defined as "actions which do not induce significant impacts on any natural,
cultural, recreational, historic or other resource." 23 CFR § 771.117(a). Here, however, the State
Historical Preservation Office has clearly declared that "replacement of the Route 120 Bridge
will result in an Adverse Effect upon the property." See NYS Office of Parks Recreation and
Historic Preservation ("State Historic Preservation Office" or "SHPO") to NYSDOT, dated
December 15, 2005. Indeed, the DOT and FHWA acknowledge that the project would have an
adverse impact on the National Register eligible Bridge. See Memorandum of Agreement among
FHWA, SHPO and NYDOT, dated August 16, 2006. Therefore, the project clearly does not
qualify as a CE under the § 771.117(a) regulation.

Even if the proposed project met the definition of a CE, it would be exempted from such
a classification under Part 771.117(b). That subpart states: "Any action which normally would
be classified as a CE but could involve unusual circumstances will require the Administration, in
cooperation with the applicant, to conduct appropriate environmental studies to determine if the
CE classification is proper." 23 CFR § 771.117(b) (emphasis added). This subpart further
provides that one such "unusual circumstance" is "significant impacts on properties protected by



William Gorton, P.E.
June 25, 2008
Page 3

Sections 4(f) of DOT Act [49 USCA § 303 (2005)] and 106 of National Historic Preservation Act [16 USCA 470f (West 2005)]." 23 CFR § 771.117(b)(3). This special circumstance is present here, as: (1) the Bridge itself is National Historic Register eligible (National Historic Register "eligible" properties are those that have been determined eligible under 36 CFR Part 63 or otherwise meet National Historic Register criteria, thus receiving protection) and (2) the Bridge is in close proximity to and of a piece with the Chappaqua Train Station and Depot Plaza, both of which are registered National Historic Properties.

The NYSDOT was required to conduct an appropriate environmental study to determine if the CE classification is proper because the Bridge is an historical property subject to the requirements of sections 4(f) of the DOT Act and 106 of the National Historic Preservation Act. This study was never conducted and, therefore, DOT failed to conduct an appropriate environmental review.

The project also does not qualify as a CE because it is not included on the list of actions that are set forth in Part 771.117(c) as Class II Categorical Exclusion (CE) activities. *See* 23 CFR § 771.117(c).

Finally, the Project cannot be considered a CE under 23 CFR Part 771.117(d). Under a separate list of actions contained in § 771.117(d), which includes bridge reconstruction projects, the Project may meet the criteria for CE status "only after Administration approval" upon submission by the applicant of "documentation which demonstrates that the specific conditions or criteria for these CEs are satisfied and that significant environmental effects will not result." 23 CFR § 771.117(d).

As noted in the Final Design Report dated October 2006, the Project falls under two § 771.117(d) categories: (1) modernization of a highway by...reconstruction...or adding auxiliary lanes; and (2) bridge reconstruction. The Final Design Report noted the same. It states that the agency has made a <u>preliminary</u> determination that the project meets the requirements of a Categorical Exclusion with documentation in accordance with 23 CFR Part 771.117(a) and (d). See Report, at IX-2.

Appendix F of Final Design Report, titled NEPA Checklist, contains the following question:

> 23.     "Is the project listed in 23 CFR 771.117(d) (D list) or is the project an action similar to those listed in 23 CFR §771.117(d)?"

Clearly if this question were answered "yes", the applicant would need to submit documentation to show that the project should be considered a CE and that significant environmental effects will not result. However, question no. 23 was left unanswered, when it should have been answered "yes" because the NYSDOT acknowledged in the body of the Final Design Report that the Project qualifies as a D list project. The applicant should thus have submitted the required documentation.

William Gorton, P.E.
June 25, 2008
Page 4

There is, in fact, a November 1, 2006 FHWA letter annexed to Appendix G noting its approval of project as a Categorical Exclusion, but this approval is without support in the record, given the incomplete NEPA checklist and the seeming failure of NYSDOT to submit documentation in accordance with 23 CFR § 771.117 (d).

Therefore, it is clear that the bridge reconstruction project does not automatically or otherwise qualify as a Class II (CE) action; rather it requires an environmental study under 771.117(b), and thus FHWA's approval of the project as a CE based on the applicant's supporting documentation was improperly made.

Moreover, the FHWA regulations state that an Environmental Assessment (EA) is required when the proposed action is an "action in which the significance of the environmental impact is not clearly established." These are actions that do not fall under the Class I actions set forth in § 771.115(a) or the Class II actions (CEs) discussed above. Since the proposed project did not clearly qualify as a CE, an EA was warranted.

The § 4(f) Evaluation of Alternatives was Inadequate.

As you are aware, before NYSDOT can approve this project, it must undertake a DOT Act § 4(f) evaluation, which is required for any transportation project that will use resources that are on, or eligible, for the National Register of Historic Places, such as the Route 120 Bridge here. NYSDOT performed a § 4(f) evaluation in October, 2005.

The alternatives on which NYSDOT based its § 4(f) evaluation in the October 2006 Final Design Report were inadequate. Before a federal transportation project may be approved, § 4(f) requires:

> § 303. Policy on lands, wildlife and waterfowl refuges, and historic
> sites.
>
> (c) Approval of programs and projects. Subject to subsection (d),
> the Secretary may approve a transportation project (other than any
> project for a road or parkway under section 204 of title 23)
> requiring the use of ... land of an historic site of national, State or
> local significance (as determined by the Federal, State, or local
> officials having jurisdiction over the ... site) only if —
>
>> (1) there is no prudent and feasible alternative to using that
>> land; and
>> (2) the program or project includes all possible planning to
>> minimize harm to the ... historic site resulting from the use.

*See* 49 U.S.C.A. § 303(c) (West, 2005).

The October 2006 Final Design Report seemingly considers five alternatives; three of those alternatives – the reconstruction alternatives – are essentially the same. All three variations



William Gorton, P.E.
June 25, 2008
Page 5

of Alternative 3 propose reconstructing the bridge with three lanes. The only differences among these alternatives are that the offset of the centerlines varies slightly, as well as the time allotted for construction. The other two alternatives are "rehabilitation" and "no action".

The "rehabilitation" alternative was given only a cursory review in the October 2006 Final Design Report. At $3.5 million, the "rehabilitation" alternative is only a little more than 50% of the supposed cost[1] of the "bridge replacement alternative." No criteria other than the prohibited more than 65% rule were applied, and even that one may have been improperly applied. This is an alternative that should have been more fully considered before determining that the bridge needs to be completely replaced, rather than rehabilitated.

The October 2006 Final Design Report repeatedly notes the need to maintain two lanes of traffic during construction to avoid lane closures. Indeed, this requirement is one of the reasons the § 4(f) evaluation rejected the rehabilitation alternative. That evaluation, contained in the October 2006 Final Design Report, states:

> During construction, two-way traffic will need to be maintained at all times. The existing bridge section is not wide enough to accommodate two-way traffic without modifying and widening the existing structure. These modifications to the existing bridge would have a significant adverse effect on the character of the existing historic bridge.

Final Design Report, October 2006, at V-3.

However, it is clear from the discussion at a Town board meeting with the NYSDOT on June 24, 2008 that, not only was the third lane not really necessary because it will not eliminate lane closures during construction, but also the public was misinformed about lane closures resulting from the reconstruction. In fact, if lane closures were an inevitable part of the construction process, NYSDOT could have chosen the rehabilitation alternative without worrying about modifying and widening the existing bridge.

Moreover, the destruction of an historic bridge is certainly not a *de minimis* impact on the protected property. The DOT Act provides that the § 4(f) requirements will be satisfied if the FHWA determines the project will have a *de minimis* impact on the area. *See* 49 U.S.C. § 303(d). For historical sites, the agency may make a finding of *de minimis* impacts only if:

        (A)    the Secretary has determined, in accordance with the consultation process required under section 106 of the Nation Historic Preservation Act (16 U.S.C. 470f), that –

                (i)    the transportation program or project will have no adverse effect on the historic site; or

---

[1] We have been told that actual approved and approvable bids for thi work are far more than two times $3.5 million.



William Gorton, P.E.
June 25, 2008
Page 6

> (ii)   there will be no historic properties affected by the transportation program or project;
>
> (B)   the finding of the Secretary has received written concurrence from the applicable State historic preservation officer or tribal historic preservation officer (and from the Advisor Council on Historic Preservation if the Council is participating in the consultation process); and
>
> (C)   the finding of the Secretary has been developed in consultation with parties consulting as part of the process referred to in subparagraph (A).

*See* 49 U.S.C.A. § 303(d)(2) (West 2005).

The agency has not and cannot meet these requirements because the destruction of the National Historic Register eligible bridge does not constitute a *de minimis* impact.

## A Supplemental §4(f) Evaluation was required, but never conducted.

Even if the § 4(f) evaluation had been adequate, which is not the case, the NYSDOT failed to supplement its § 4(f) evaluation after there were significant changes made to the design of the bridge reconstruction in June 2007.

The regulations require that a separate § 4(f) evaluation be undertaken when a proposed "modification of the design or measures to minimize harm would result in a substantial increase in the amount of § 4(f) land used, a substantial increase in the adverse impacts to the § 4(f) land, or a substantial reduction in mitigation measures." *See* 23 CFR Part 771.135(m)(3).

Although the October 2006 Final Design Report contains NYSDOT's § 4(f) evaluation, documents that we have reviewed indicate that the design of the project was in flux until October 2007 and, indeed, the project design and scope changed substantially between the time of the October 2006 Final Design Report and the design was finalized before going out to bid in October 2007. Therefore, a supplemental §4(f) analysis should have been performed.

In the October 2006 Final Design Report, the existing two lanes were to be replaced and an additional lane added as a "bump out" from the southern lane to accommodate two lanes of traffic during construction, which would eventually become the third lane.[2] However, the design drawing attached to that Report show that there would still only be two lanes going into the hamlet. With respect to the remainder of Route 120 west of the bridge, the October 2006 final design report notes, "[t]he only change in lane configuration would include a right hand 'slip ramp' from Quaker Street westbound onto Hunts Place." October 2006 Final Design Report, at III-6.

---

[2] According to the 2005 § 106 Report, the third lane would only require widening the bridge by 10 feet. The October 2007 final design, however, shows that the bridge widening would actually be 18.2 feet.



William Gorton, P.E,
June 25, 2008
Page 7

Although the Project plan included the "bump out" from the south travel lane early on, the Town only decided in its June 19, 2007 work session (eight months after the § 4(f) evaluation in the October 2006 Final Design Report) that the "bump out" would, instead, become a complete third lane spanning the entire length of the bridge and adding another lane of traffic entering the hamlet. As noted above, at the time of the § 4(f) evaluation, there were still only two lanes going into the hamlet. The revisions to the design plan to accommodate the additional travel land going into the hamlet were not made until after the June 19, 2007 work session, which was well after the project had already undergone § 106 and § 4(f) reviews.

The consequence of finalizing the plan for the third lane in June 2007 is that the project had to be modified to provide for an additional travel lane to come into the hamlet. These revisions include changing the length of the retaining wall and revising the alignment of the travel lanes from the Bridge to the hamlet.

The § 106 findings documentation notes that the length of the retaining wall needed to support this third lane would only be 25 feet extending east of the bridge.[3] Based on drawings that accompany the October 2006 Final Design Report, it appears that NYSDOT planned to extend the retaining wall further toward to the hamlet to 164 feet. Finally, it was not until October 2007 that the final plan to build the retaining wall to extend out 264 feet was revealed in the plans that went out to bid. This is a significant change with a substantial impact because this new design will eliminate the existing trees and grassy approach ramp leading to the village.

The Historic American Engineering Record (Level II Documentation) of the Route 120 Bridge from the New York State Museum records explains the aspects of this bridge that make it historically special and unique:

> Contributing elements consist of the intact stone abutments, wing walls, buttress walls, parapet walls, stairways, and corner columns, and steel railings.

It is not clear from the documentation we have reviewed or that otherwise exists that the new retaining wall will retain the special characteristics of the wing walls and buttress walls described above.

Additionally, the new third lane will clearly change traffic patterns in the hamlet because the other travel lanes will have to be re-aligned to accommodate the new lane. Vehicles crossing the bridge into town will no longer be allowed to make a sharp right turn into the parking lot off of South Greely Avenue. Instead, all vehicles wanting to access that area will have to continue straight on South Greely Avenue, leading to increased traffic near the school crossing. There have been no studies since 2000 (before the plan was developed to rebuild the bridge to replace two lanes with three lanes) with regard to the hamlet's intersections and traffic flow.

---

[3] There is no reference in the October 2006 Final Design Report to the retaining wall and how long it will need to be.

William Gorton, P.E.
June 25, 2008
Page 8

In addition to this substantial change in design, as of June 2007 it was still uncertain whether there would be a stairway from the south side of the Route 120 Bridge down to the Metro-North railroad platform underneath. In an e-mail dated May 9, 2006, NYSDOT requested that the Town submit a letter to NYSDOT stating that the Town approved Architectural Concept III for the bridge barrier system. NYSDOT planned on resubmitting this letter to SHPO as part of the approval that NYSDOT had to obtain from SHPO (presumably in response to SHPO's letter of December 15, 2005 warning that the project would have an Adverse Effect on the National Register eligible bridge). NYSDOT told the Town not to mention the issue of whether there would be a stairway from the bridge to the MTA platform in the letter the Town was preparing. Therefore, it appears that SHPO was not presented with all relevant information before it had to analyze the project.

As noted above, in the New York State Museum records, the design of the stairways are another element of the unique historical quality of this Bridge. This change to the design plan and the addition of a complete third lane of traffic into the hamlet are exactly the type of changes that fall under 23 CFR § 771.135(m)(3) and require a supplemental § 4(f) evaluation.

\* \* \*

For these reasons, we believe the final design of this project was not fully evaluated in the manner it should be as set forth in 23 CFR Part 771, and the final project was too hastily approved.

We would like to discuss these issues further with you and your office well before any demolition work. Please advise us of a convenient time for you to meet.

Very truly yours,

James J. Periconi

Cc.: Ms. Barbara Gerrard, Supervisor
Mr. Gennaro Faiella, Town Administrator
Mr. Robert Cioli, Acting Town Engineer

Ms. Astrid Glynn, Commissioner of Transportation, NYSDOT
Joan Dupont, P.E., Region 8 Director, NYSDOT
Sandra Jobson, P.E., Region 8, NYSDOT

Christopher Gatchell, P.E., District Engineer, FHWA

# EXHIBIT B



PERICONI, LLC
708 THIRD AVENUE
NEW YORK, NEW YORK 10017

TEL 212·213·5500
FAX 212·213·5030
jpericoni@periconi.com
www.periconi.com

August 13, 2008

**VIA E-MAIL AND**
**FIRST CLASS MAIL**

Keith D. Martin, Esq.
New York State Department of Transportation
50 Wolf Road
Albany, New York 12232

**Re:    Route 120 Bridge Reconstruction, Chappaqua, New York**

Dear Mr. Martin:

As you are aware, this firm represents the Concerned Citizens of Chappaqua ("Concerned Citizens").

On June 25, 2008, this firm sent a letter to your office, which set forth the Concerned Citizens' position that New York State Department of Transportation ("NYSDOT") and the Federal Highway Administration ("FHWA") have failed to comply with the requirements of the National Environmental Policy Act ("NEPA"), as codified at 40 CFR Part 1500 et seq. and 23 CFR Part 771. Our letter requested that NYSDOT undertake a fresh examination of the problem in compliance with NEPA.

We have since discussed in detail the contents of that letter with your office, specifically with you and, more briefly, NYSDOT's Legal Services Division Chief, Bruce Feldman, Esq. You advised me by telephone call on August 8, 2008 that, following a review by the NYSDOT and the FHWA, which is part of the U.S. Department of Transportation (USDOT), those agencies have concluded that no errors or omissions were made by them in the review process, and the project will go forward as scheduled, beginning with site clearance, starting no sooner than August 20, 2008.

Unless we hear from you otherwise, we will assume this is the position of NYSDOT and the FHWA, reflecting its plan and timetable. We appreciate the courtesy reflected in your providing us with this information. We, in turn, will inform you of any planned legal action to be taken by the Concerned Citizens.



Keith D. Martin, Esq.
August 13, 2008
Page 2

Of course, if you have any questions or comments, do not hesitate to contact us.

Very truly yours,

James J. Periconi

Cc.:   Ms. Astrid Glynn, Commissioner of Transportation, NYSDOT          (via facsimile only)
       Bruce Feldman, Esq., Legal Services Division Chief, NYSDOT        (via facsimile only)
       Joan Dupont, P.E., Region 8 Director, NYSDOT                      (via facsimile only)
       Sandra Jobson, P.E., Region 8, NYSDOT                             (via facsimile only)

       Christopher Gatchell, P.E., District Engineer, FHWA               (via facsimile only)

# EXHIBIT C



**STATE OF NEW YORK**
**DEPARTMENT OF TRANSPORTATION**
**ALBANY, N.Y. 12232**
www.nysdot.gov

ASTRID C. GLYNN
COMMISSIONER

DAVID PATERSON
GOVERNOR

August 15, 2008

***Via Facsimile 212.213.5030***
James J. Periconi, Esq.
Periconi, LLC
708 Third Avenue
New York, NY 10017

### Re: Route 120 Bridge Reconstruction Chappaqua, NY -- PIN 8026.08.121

Dear Mr. Periconi:

We acknowledge and thank you for your letter dated August 13, 2008 which followed my telephone conversation with you on August 8, 2008.

On August 8th we advised you that NYSDOT and FHWA have each thoughtfully, fully and with great care, examined this matter and reviewed the project documentation which now includes a comprehensive DONSI as required by SEQRA. FHWA is satisfied, as are we, that the record is complete and has integrity.

At the conclusion of our conversation on the 8th you asked for a rough timetable for construction. We advised you that we expected site preparation work to intensify in late August, we expected to begin erection of a pedestrian bridge on or about Sept. 15th (this will take approx. 30 days to complete), and on or about October 15th we expected to then begin "Stage I" in which we would take down 1/2 of the bridge superstructure.

The October 2006 Final Design Report and supporting documentation describe, among other things, the need for the project, the alternatives considered, and the work to be performed – Alternative # 3 Bridge Replacement, including Sub-Alternative 3B (M&PT Option B).

The Town of New Castle, by letter dated July 11, 2007, requested a revision to the project's Final Design Report. NYSDOT agreed to the request of the Town. The revision requested by the Town would extend the third lane proposed on the new bridge to the east and create a new island on each leg of the existing triangular island at the

intersection of Route 120 with Greeley Ave. The existing Route 120 roadway is a two-way roadway with one lane in each direction. The design report was prepared with the bridge carrying Route 120 over MNRR having three lanes to accommodate two lanes of traffic on Route 120 during all stages of construction.

The Town's request to extend the third lane from the new bridge over the MNRR will be a positive improvement for traffic flow. The intent of this work is to retain the existing traffic patterns and provide a much needed improvement to the flow of traffic. During existing conditions, traffic eastbound on Route 120 making a left turn onto Greeley Avenue (northbound) backs up to the west. This backup of eastbound traffic blocks traffic trying to make a right turn onto Greeley Ave. (southbound). The third lane on the bridge will be extended to Greeley Ave southbound to create a right turn lane while the existing center lane will become the left turn lane at Greeley Ave. A stone faced retaining wall will be constructed along the south side of Route 120 to accommodate the right turn lane and not impact the railroad station parking lot. The new islands on each leg of the existing triangle intersection will help reduce excess pavement and channelize traffic better. The existing curb lines on each leg will essentially be unchanged except for the south side where the right turn lane has been added. The gore of the triangle intersection will be extended to the west to reduce the amount of pavement.

We took a hard look at the concerns you raised in your June 25th letter. NYSDOT has determined, with FHWA concurrence, that the post-October 2006 project modifications do not alter the original findings associated with the State Environmental Quality Review (SEQR) Act or the National Environmental Protection Act. Additionally, there will be no additional negative social, economic or environmental impacts associated with the overall project as a result of this additional work. The proposed additional work does not impact the reconstruction of the bridge (BIN 1037350) over the Metro-North Railroad and Railroad Street. As such, the findings and determinations associated with the Federal Highway Administration (FWHA) Programmatic Section 4(F) Evaluation in association with the NYSDOT, Advisory Council on Historic Preservation (ACHP) and the State Historic Preservation Office (SHPO) are still valid.

Thank you for your interest in this project. If there are any more questions or concerns do not hesitate to contact me directly.

Very truly yours,

KEITH D. MARTIN
Associate Attorney
Division of Legal Affairs

KDM: kdm
KDM2475/ 8.135

Cc:    J. Dupont, NYSDOT (via e-mail)
       B. Feldman, NYSDOT (via e-mail)
       R. Dennison, NYSDOT (via e-mail)
       C. Gatchell, FHWA (via facsimile)

# EXHIBIT D



PERICONI, LLC
708 THIRD AVENUE
NEW YORK, NEW YORK 10017

August 15, 2008

TEL 212·213·5500
FAX 212·213·5030
jpericoni@periconi.com
www.periconi.com

### VIA FACSIMILE ONLY

Keith Martin, Esq.
Division of Legal Counsel
New York State Department of Transportation
50 Wolf Road
Albany, New York 12232

Kenneth Dymond, Esq.
Counsel's Office
Federal Highway Administration
729 L.W. O'Brien Fed. B'lding,S719
Albany, New York 12207

### Re:  Concerned Citizens of Chappaqua, et al. v. Federal Highway Administration, et al.

Gentlemen:

As Mr. Martin knows, I am counsel to the Concerned Citizens of Chappaqua, a group of Chappaqua residents and businesses that is dedicated to preserving the historic values of Chappaqua.

For Mr. Dymond's benefit, our client's objections to the proposed Route 120 bridge project in Chappaqua, at which site work is commencing, are set forth in our letter dated June 25, 2008 (attached to Mr. Dymond's copy of this letter only), which we sent to the FHWA's District Engineer, Christopher Gatchell, P.E., as well as to the NYSDOT and others.

The purpose of this letter is to put you on notice that on Monday, August 18, at approximately 11 a.m., in the federal courthouse at 300 Quarropas Street in White Plains, in Westchester County, we will be filing our complaint, and seeking by Order to Show Cause to move for a preliminary injunction to halt all site work that is part of this project until the merits of the claims we raise under the National Environmental Policy Act, the National Historic Preservation Act and the Department of Transportation Act can be heard by the court.  In our Order to Show Cause, we will also seek a restraining order on Monday, August 18, to prevent any felling of trees until such time as our motion for a preliminary injunction can be heard and decided.

Very truly yours,

James J. Periconi

Enclosure (June 25, 2008 letter)

James J. Periconi
Delight D. Balducci
PERICONI, LLC
708 Third Avenue, 17th Floor
New York, New York 10017
(212) 213-5500
*Attorney for the Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
CONCERNED CITIZENS OF CHAPPAQUA,
CHARLES NAPOLI and GINA GORE,

                     Plaintiffs,

       -against-

UNITED STATES DEPARTMENT OF
TRANSPORTATION (FEDERAL HIGHWAY
ADMINISTRATION), NEW YORK STATE
DEPARTMENT OF TRANSPORTATION,

                    Defendants.
--------------------------------------------------------X

CIVIL ACTION

DOCKET NO.: _____

**AFFIDAVIT**

CHARLES NAPOLI, being duly sworn, deposes and states:

1.      I am a New York State registered architect and have structural engineering

credentials, a member of the Town's Landmarks Advisory Committee, and a founding member

of Concerned Citizens of Chappaqua ("Concerned Citizens"), the plaintiff organization dedicated

to the preservation of the quaint Charming small town feel of the Chappaqua Hamlet. I have

lived and worked in the hamlet of Chappaqua in the Town of New Castle for more than 35 years;

for much of that time, from 1980 – 2002, I worked in a studio on the second floor of 59 Greeley

Avenue, immediately across from traffic leaving the bridge and entering the hamlet.

2.      I submit this affidavit in support of a temporary restraining order and a motion for

a preliminary injunction, restraining the New York State Department of Transportation

(NYSDOT) and its contractors from commencing to cut down up to 61 mature trees in the immediate vicinity of Chappaqua's historic Route 120 bridge, which is a National Historic Register eligible property, adjacent to two National Historic Register properties, namely, the Chappaqua Train Station and Depot Plaza. *Preliminary work to do so commenced on Friday, August 15, 2008*, as explained hereinafter, but counsel informs me that nothing other than continued site clearance activities will take place before the close of business on August 18, 2008.

3.      Among the 61 trees to be felled are about one dozen large – 50' to 70' tall – oaks and sycamores that are upwards of 75 or more years old. They are healthy and their vigor is good. They are irreplaceable, under any definition. Five color photos of one of these trees are attached to this affidavit as Exhibit I. They make an enormous contribution to the beauty of Chappaqua. The oaks and sycamores range between fifty and seventy feet in height. These trees are in the pathway of destruction and will need to be cleared in order for the Defendants to commence construction work on the Bridge. These oak and sycamore trees, among others, located downtown near the Bridge and adjacent to Depot Plaza and the Chappaqua Train Station – two National Historic Register of Places – beautify the hamlet of Chappaqua, as the photos. The Town's own "renewed community vision for . . .downtown [Chappaqua]" was drawn in part from a report prepared by the Project for Public Spaces, Inc., in June 2007, which reflected the citizenry's extolling "green," "attractive," "historic" and "sheltering" aspects of the existing downtown that is, the very qualities of these trees.[1] The demise of these trees would be devastating to the small hamlet feeling that is so important to long-time residents of Chappaqua like myself and my wife, who raised our two children in Chappaqua. Other trees among the 61 include black walnuts, crab apples, sweet gums and Bradford pear trees.

---

[1] www.town.new-castle.ny.us/PPS%20REPORT%20-%20JUNE%202007.pdf

2

4.      The facts set forth herein are based on my several years as a member of the New Castle Landmarks Advisory Committee, and before that, during which I have followed the seven-year process in which what was originally a bridge rehabilitation project. All statements herein are based either on personal observations, documents I have reviewed, or conversations I have had with public officials in all of the relevant agencies.

5.      Before I review the facts, however, I want to express the frustration all of us who are part of Concerned Citizens feel at the lack of public involvement from early on in the planning process. Neither were any of the Town's community committees, like Planning or Architectural or Landmarks Advisory or Beautification, or the Project for Public Spaces, Inc., whose report is cited herein, were consulted on bridge design, or given an opportunity to make comments in any meaningful way during this process.

6.      In addition, one of the three most important aspects of why this project is so wrong for Chappaqua – the first two are the prospective loss of 61 trees and the destruction of the historic bridge – is the retaining wall that is to be built. I want this Court to understand that how *huge* the retaining wall that will need to be built to shore up the bridge and approaches is: it is *an order of magnitude different* from the current 25 foot retaining wall, which was the same size in virtually all drawings reviewed by agencies and in public meetings up through the June 2, 2006 letter of NYSDOT to SHPO attached to this affidavit as Exhibit E.

7.      Instead, by my careful measurement of several of the construction drawings in the construction bid documents, I have determined that the actual length of it is not the 264 feet that we had heard, but rather *291.995 feet – just eight feet shy of a football field length.*

8.      This retaining wall, purportedly planned to have some of the architectural aspects of the current 25' retaining wall, will utterly overpower the bridge and this important public area

3

of downtown Chappaqua.    Commuters to and from the City from our hamlet will see this monstrosity every day as they move from their cars parked at National Register of Historic Places Depot Plaza (or adjoining parking area) to the Chappaqua train station, which is also on the National Register itself.  This view is evident from photo 3 of Exhibit I.

9.    Such a monstrosity is absolutely not in context with the rest of Chappaqua. Ironically, the FHWA has trumpeted its "Context Sensitive Solutions" policy,[2] when this huge project is anything but "context sensitive."  In addition, there have been no traffic studies since 2000 (before the plan was developed to rebuild the bridge to replace two lanes with three lanes) with regard to the hamlet's intersections and traffic flow.  Instead, the Town has its fingers crossed, in effect, that the additional lane of traffic coming into the Village will result in "hopefully reduced backup"; the extra lane "should help ease the morning traffic flow." *See* Town Supervisor's Report (2/8/08). http://www.town.new-castle.ny.us/120%20 bridge%20Update.pdf.

10.    The bridge rehabilitation project, expected to cost $3.5 million, morphed in the last year or two into a significant bridge replacement project, the winning bid for which is $17,844,871 million, including approaches and the intersection at Hunt Lane (on the other side of the Metro North tracks).  The widening of the bridge from two to three lanes is a permanent change that was meant to deal with a temporary (i.e., during construction) problem of always wanting one lane open each way, to prevent traffic congestion during the multi-year life of the project.  Apparently, it will not even accomplish that objective.

---

[2] http://www.fhwa.dot.gov/context/index.cfm

**FACTS:**

**a. Pre-2007**

11.    The Historic American Engineering Record ("HAER") (Level II Documentation) of the Route 120 Bridge from the New York State Museum records explains the aspects of this bridge that make it historically special and unique in the course of an extensive report about the relationship of the Bridge to Chappaqua's history:

> Contributing elements consist of the intact stone abutments, wing walls, buttress walls, parapet walls, stairways, and corner columns, and steel railings.

A copy of the HAER Level II documentation is attached hereto as Exh. A.

12.    By letter dated April 11, 2007, the Town Historian, who is also the Chairman of the New Castle Landmark Advisory Committee, in urging preservation of as many elements of the existing bridge, declared that "the railroad bridge is indeed of historic significance." A copy of the letter of Gray Williams, dated April 11, 2007 is attached hereto as Exh. B.

13.    The Bridge is adjacent to two properties that are listed on the National Register of Historic Places ("NRHP") in Chappaqua, namely, Depot Plaza and the Chappaqua Train Station. The project to either rehabilitate or to replace the Bridge was a "major federal action" in that substantial federal funds were to be expended. NEPA 42 U.S.C. § 4332(c).

14.    Both NRHP listed and NRHP eligible properties receive protection under Section 4(f) of the Federal Department of Transportation Act ("DOTA"), § 303.

15.    On or about December 2, 2005, Defendant NYSDOT prepared the Section 106 Historic Preservation Act Finding Determination required for final approval of the Project. The Section 106 HPA Finding Determination is attached hereto as Exh. C. That report concluded

that in applying the criteria of Section 800.5(b) of 36 CFR Part 800, the replacement of the

bridge "would have an ***Adverse Effect***" on the historic bridge (emphasis in original) due to

"current project objectives" formed in 2000.

16.     On or about March 7, 2006, at a Town Board work session, NYSDOT agreed to

widen the bridge on the south side during construction to three lanes of travel, rather than the

then current design of two lanes of travel (one into and one out of the hamlet). The reason was

to insure that two lanes (one in each direction) would always remain open during the

construction phase.

17.     On or about March 14, 2006, NYSDOT gave Town of New Castle (where the

hamlet of Chappaqua is located) ("Town") three design options and sought the design decision

from the Town as soon as possible.

18.     In or about October 2006, NYSDOT prepared its Final Design Report, even

though the Town had not made a final design decision. NYSDOT's report was presented at the

Town Board meeting on or about October 3, 2006. At that meeting, the third lane was once

again presented as necessary in order to maintain 2-way traffic during the construction phase.

19.     The NYSDOT's Final Design Report dated October, 2006, classified the Project

as a Categorical Exclusion under 23 CFR Part 771.117(d). Exh. F.

20.     By letter dated November 1, 2006, the FHWA concurred with NYSDOT's

assessment that "this bridge replacement project meets the conditions and criteria of a categorical

exclusion since it will not induce significant impacts." Exh. G hereto.

21.     The Categorical Exclusion classification meant that no environmental assessment

needed to be performed of the proposed Project. At the time of the Section 106 finding in

December 2005, the "small retaining wall," equivalent to the existing retaining wall, of 25 feet in length was planned for the Project.

22.    At the time of the Final Design Report in October 2006, the retaining wall had expanded from 25 feet to approximately 147 feet. Exh. F of my affidavit at App. B – Alternative 3 (bridge replacement), Plan.

23.    In fact, as only revealed in June 2007 for the first time, in the presentation documents used by defendant NYSDOT at a meeting of local Chappaqua merchants, the full length of the retaining wall was revealed to be more than 250 feet. As measured carefully, more recently, the retaining wall will be about 292'. *This is only 8 feet shy of a football field.* Exh. H hereto.

24.    Even though the October 2006 report was titled the "Final" Design Report, in fact, the design of the bridge was not final and would undergo substantial revisions within the following year, in or after June 2007.

25.    In the October 2006 Final Design Report, NYSDOT prepared a NEPA Assessment Checklist.

26.    NYSDOT did not perform environmental studies that would have led to preparation of an Environmental Assessment, as required in 23 CFR 771.115(c) for Class III actions, i.e., those that do not fall within Class I or Class II Actions

27.    On or about November 1, 2006, NYSDOT received design approval for the bridge from district Engineer Chris Gatchell of Defendant FHWA based on the October 2006 Final Design Report, signifying that the environmental process has been signed off on.

28.    On or about February 20, 2007, a New York State Historical Prevention Officer declared the bridge to be historically significant as an example of rigid steel frame span.  Exhibit A hereto.

**b. Finalization of Construction Design in 2007:**

29.    A change in the design of the Project was revealed at a Town open public meeting on or about June 12, 2007.  At that meeting, for the first time, the full extent of the new retaining wall was revealed to be even more than 160 feet.  Project design and scope changed between the time of the October 2006 Final Design Report and the time that the design was finalized before going out to bid in October 2007.

30.    In the October 2006 Final Design Report, the existing two lanes were to be replaced and an additional lane added as a "bump out" from the southern lane to accommodate two lanes of traffic during construction.  The "bump out" lane was intended to provide only a temporary solution during the construction phase.

31.    At that meeting on or about June 12, 2007, the Town Administrator announced that NYSDOT had given the Town only 10 days from that date for approval of the greatly expanded design of the Project.

32.    The Town only decided in its work session on or about June 19, 2007 (eight months after the § 4(f) evaluation in the October 2006 Final Design Report) that the "bump out" third lane would, extend as a right hand turning travel lane of traffic entering the hamlet.

33.    The revisions to the design plan to accommodate the additional travel land going into the hamlet were not made until after the work session on or about June 19, 2007, which was well after the project had already undergone § 106 and § 4(f) reviews.

8

34.    After finalizing the plan for the third lane in June 2007, the project had to be modified to provide for the extended travel lane to come into the hamlet. These revisions include changing the length of the retaining wall and revising the alignment of the travel lanes from the Bridge to the hamlet.

35.    The December 2005 Section 106 National Historic Preservation Act Finding Documentation notes that the length of the retaining wall needed to support the bump out lane would only be 25 feet extending east of the bridge.

36.    Based on drawings that accompany the October 2006 Final Design Report, however, NYSDOT planned to extend the retaining wall further toward to the hamlet to 146 feet.

37.    In June 2007, it was revealed that the actual length of the retaining wall would be much more, but how much more was unclear until the construction bid documents were first available to be seen, in October, 2007.

38.    With respect to alignment of travel lanes, according to the 2005 § 106 Report, the third lane would only require widening the bridge by 10 feet. The October 2007 final design, however, shows that the bridge widening would actually be 19.10 feet.

39.    Vehicles crossing the bridge into town will no longer be allowed to make a sharp right turn into the parking lot off of South Greeley Avenue. Instead, all vehicles wanting to access that area will have to continue southern on South Greeley Avenue, leading to increased traffic near the school crossing.

40.    Moreover, at a Town Board meeting with the NYSDOT held on June 24, 2008, it became clear that not only was the third lane not really necessary because it will not eliminate

lane closures during construction, but the public was also misinformed about lane closures

resulting from the reconstruction.

CHARLES NAPOLI

Sworn to before me this
18th day of August, 2008

Jessica Robles
Notary Public

JESSICA G. ROBLES
NOTARY PUBLIC-STATE OF NEW YORK
No. 01RO6152401
Qualified in New York County
My Commission Expires September 11, 20 /0

# EXHIBIT A

**NEW YORK STATE MUSEUM**
Research and Collections

3122 Cultural Education Center
Albany, NY 12230
518/473-1503 FAX 518/473-8496

New Castle Historical Society                                    February 7, 2007
200 South Greeley Avenue
·Chappaqua, N.Y. 10514

Dear Historian;

Enclosed is an Historic American Engineering Record Level II documentation of the bridge
carrying NY Route 120 over the Metro-North Railroad, in Chappaqua, Westchester County.

The report was prepared by the Cultural Resource Survey Program of the New York State
Museum, at the request of the New York State Department of Transportation, to mitigate adverse
impact to the bridge under Section 106 of the National Preservation Act.

The New York State Office of Parks, Recreation and Historic Preservation has determined the
Route 120/Metro-North Railroad bridge to be historically significant as a distinctive example of
a rigid steel frame span. The bridge was designed by Jay Downer of the Westchester County
Park Commission to carry the aesthetic of the adjacent Saw Mill River Parkway and the New
York Central Railroad Station at Chappaqua. A symbol of progress for Chappaqua, the bridge
was opened as the centerpiece of the village bicentennial celebration in 1930.

The Department of Transportation has classified the bridge as functionally obsolete and has
determined that the bridge be removed to meet the current project objectives.

The enclosed report is provided to the New Castle Historical Society at the courtesy of the State
Department of Transportation.

Sincerely,

Mark S. LoRusso
Cultural Resource Survey Program
New York State Museum

enclosures

# An Historic American Engineering Record

# Level II Documentation

of the

## STATE ROUTE 120 BRIDGE
## SPANNING METRO-NORTH RAILROAD

NYS DOT PIN 8026.08.101
State Route 120/Metro-North Railroad
Town of New Castle
Hamlet of Chappaqua
Westchester County
New York

prepared by

Mark S. LoRusso

sponsored by

The Federal Highway Administration
The New York State Department of Transportation

## CULTURAL RESOURCES SURVEY PROGRAM

# NEW YORK STATE MUSEUM



HISTORIC AMERICAN ENGINEERING RECORD
STATE ROUTE 120 BRIDGE OVER METRO-NORTH RAILROAD

Location:

State Route 120 Bridge
Spanning Metro-North Railroad and Allen Place
Hamlet of Chappaqua / Town of New Castle
Westchester County, New York
UTM: 18.602820.4556900
Quad: *Ossining N.Y.* 1:24,000

Type:

Rigid steel frame

Dates of Construction:

1929-30

Engineer:

Jay Downer, Chief Engineer, Westchester Park Commission
_____, Chief Engineer, New York Central Railroad Harlem Division

Builder:

P. T. Cox Contracting Company

Present Owner:

New York State Department of Transportation

Present Use:

Vehicular bridge (BIN 1-03735-0)

Significance:

The Route 120 / Metro-North Railroad Bridge is significant as a highly visual
example of a rigid steel frame bridge in Westchester County. Designed by Jay
Downer of the Westchester County Park Commission, in conjunction with the
New York Central Railroad, the rustic stone bridge carries the aesthetic of the
adjacent Saw Mill River Parkway and reflects the architecture of the New York
Central Railroad station at Chappaqua, built in 1902. The bridge is also
significant as an historic symbol of progress for Chappaqua, opened as the
centerpiece of the village bicentennial celebration in 1930.

Contributing elements consist of the intact stone abutments, wing walls,
buttress walls, parapet walls, stairways, and corner columns, and steel railings.
The principal change to the appearance of the bridge has consisted of the
replacement of all but two of the original cast iron lamp posts and acorn lamps
with modern acorn lamps.

Project Information:

The New York State Department of Transportation has determined
the Route 120 / Metro-North Railroad Bridge to be unsafe for vehicular traffic
due to serious deterioration, including deficiencies in the deck, curbs, wearing
surface, primary members (Span 1) and pedestals (NYS DOT Finding
Documentation 2005). Due to these factors and the need for a wider span, the
Department of Transportation has proposed removal, rather than rehabilitation
of the bridge, under PIN 8026.08.101. The Department of Transportation has
requested this Level II Historic American Engineering Record documentation to
mitigate the adverse effect to the bridge resulting from its removal.

Mark S. LoRusso
Cultural Resources Survey Program
Research and Collections
New York State Museum
Albany, New York 12230

SR 120 / Metro-North RR Bridge
(Page 2)

*Bridge Setting*

The Route 120 / Metro North Railroad Bridge is located in the hamlet of Chappaqua, a residential community in the northern suburbs of New York City. The Metro North Railroad and the Saw Mill River Parkway provide commuter access between Chappaqua and the New York metropolitan area. Route 120 connects to Interstate 684 and the Taconic State Parkway, also main links to New York City and Connecticut.

Chappaqua contains a small business district along South Greeley Avenue and King Street, east and north of the bridge. The Metro-North Railroad station, a National Register Listed property, is located south of the bridge and is reached from Woodburn Avenue and Allen Place. Parking lots flank both sides of the bridge. Landscaping consists of deciduous and coniferous trees, shrubs, and manicured lawns, with a triangular green at the intersection of Route 120 and South Greeley Avenue. Lighting is by decorative street lamps on the bridge and by overhead lights on adjacent streets.

Areas west of the bridge, between the railroad and Saw Mill River Parkway, are overgrown with trees and scrub vegetation. Landscaped dwelling lots are located further west beyond the parkway.

*Bridge Description*

The Route 120 / Metro North Railroad Bridge is a two-span steel frame structure with decorative stone facing. The bridge is 133 feet 6 inches in length, consisting of a 72- foot span over the Metro North Railroad and a 45-foot span over Allen Place. The bridge is 40 feet wide with a 30-foot roadway and five-foot sidewalks. As originally planned, the clearance was to be 21.5 feet over the railroad and 18.5 feet over Allen Place. The as-built clearance over Allen Place was eventually lowered to 16 feet.

The bridge frame consists of a series of haunched (arched) column girders and cross beams built from riveted steel plates and angles. The girders are multiple sections spliced together with fillet plates above and below the quarter points of the span. They are stiffened by riveted steel angles, with sidewalk brackets acting as stiffeners on the exterior girders. Each span has four girders spaced 12 feet apart. The six cross beams on the railroad span are spaced 10 feet 3 inches and 13 feet 3 inches apart. The four cross beams on the Allen Place span are spaced 9 feet 10 inches apart. The underside of the railroad span is encased in gunite, originally used to protect against coal fumes from passing steam engines.

The frame dimensions are as follows. The girders are 14 inches wide with variable depths. On the railroad span, the exterior girders have depths of two feet at the base of the columns and 2 feet 7/8 inches at the centerline of the arch, and radii of 5 feet 9-5/8 inches at the spring line of the arch (top of abutment). The interior girders have respective dimensions of two feet, 1 foot 6 inches, and 4 feet 8-1/2 inches. On the Allen Place span, the exterior girders have depths of 2 feet at the base of the columns and 2 feet 7/8 inches at the centerline of the arch, and radii of 7 feet 1/4 inch at the spring line of the arch. The interior girders have respective dimensions of 2 feet, 1 foot 6 inches, and 4 feet 8 inches. The cross beams on both spans are 6-7/8 inches wide with variable depths matching the girder depths.

The bridge rests on reinforced concrete piered footings encased within the abutments and center pier. The footings for the west end railroad span and east end of the Allen Place span are 44 feet 6 inches across and 8 feet 6 inches wide. The combined footing between spans is a 45 foot 6 inch x 16 foot box with a slab floor and interior bracing. The abutments are formed by 1 foot 3 inch thick cut-off walls beneath the bridge with stepped buttress walls along the approaches, and wing walls off the abutment corners. The center pier is formed by 1 foot 4 1/2 inch thick curtain walls on each side of the box footing.

The original deck consisted of a nine-inch thick reinforced concrete slab and a three-inch thick concrete wearing surface. The approaches were built with a nine-inch thick concrete slab surface on a 12-inch bed of gravel. The existing roadway has an asphalt covering over the concrete. The curbs, gutters, and sidewalks are concrete.

The bridge has three stairways originally built to access waiting platforms along the railroad. Active north and south stairways between spans descend to the sidewalk on the east side of the railroad. These have arched girder stringers supported on center piers and independent abutments against the bridge. An abandoned stairway at the southwest corner of the railroad span has an enclosed base with straight girder stringers supported in the same fashion. It is built into the fill slope with a retaining wall on the railroad side. All of the stairways are five feet wide with center landings.

The bridge and stairways have steel railings between rectangular stone columns at the stairway landings and ends of the bridge. The railings are 3 feet 3 inches high, with pressed steel top rails, square intermediate posts, and round pickets. Stone parapets cap the buttress walls along the east approach and north side of the west abutment. Wooden plank and rail fences originally used for the outer portions of the approaches have been replaced by metal guide rails on the east approach, and by a rustic wooden fence between the railroad bridge and the Saw Mill River Parkway bridge.

Blue grey sandstone (bluestone) facing is used on the exterior masonry walls including the buttress walls, wing walls, parapet walls, stairway abutments, piers, columns. The facing is 12 inches thick and anchored to the structural concrete every three feet. Dark colored granite is used for capstones on the columns and parapet walls.

The original lights proposed for the bridge were to be clear glass Westinghouse Octagonal Junior General Electric Form #18 Ornamental Lanterns. Bridge plans show that a total of 22 lights on octagonal cast iron standards were to be placed on the columns on the stairways and ends of the bridge. Photographs taken at the completion of the bridge show that lights with translucent acorn-shaped globes were ultimately used on the bridge and along the approaches in both directions. Modern replacement lights on the bridge approximate the look of these lights. Two of the original standards, with broken lantern bases still attached, remain on the abandoned stairway.

Alteration of the bridge has included reinforcement of diaphragms on some of the girders and the addition of support posts under the south center stairway. Visible deterioration consists of corrosion of the frame and deterioration of the deck on both spans, spalling of the gunite coating on the railroad span, corrosion of the girders on the south center stairway, corrosion of the railings, and deterioration of the sidewalks.

*Historical Context*

Chappaqua and the surrounding towns were first settled by Quakers and Anglicans in the early 1700's. Difficult to farm and isolated from primary highways, these areas saw limited growth before the arrival of the New York and Harlem Railroad in 1846. The Harlem Railroad was built to link New York City with product sources in Poughkeepsie and Albany. With a station at Chappaqua, the railroad improved market access for New Castle cider, vinegar, and other produce, promoting local agriculture and settlement. The railroad brought Horace Greeley to Chappaqua in 1854, where he built a summer house and established a gentleman farm. Farming would stagnate in the late nineteenth century despite the railroad, though some manufactories with rail access succeeded.

The twentieth century brought a shift from farming to suburban development in Chappaqua. A picturesque area with plenty of available land, Chappaqua attracted industrialists, wealthy landowners, and others seeking refuge from downstate urban settings. A passenger station built by the New York Central Railroad at Chappaqua, in 1902, ushered in this movement. A steady stream of new settlement in the first two decades of the 1900's gained momentum with the approach of the Saw Mill River Parkway in the 1920's.

The Saw Mill River Parkway was authorized in 1923 by the Westchester County Parkway Commission in a plan for future parkway development in Westchester County. The plan was prepared by Jay Downer, who came to the commission having served as design engineer for the landmark Bronx River Parkway. The new parkway would follow the Saw Mill River northward through Yonkers, Ardsley, Elmsford, Mount Pleasant, Pleasantville, Chappaqua, Mt Kisco and Katonah. Advanced knowledge of the route spurred a frenzy of land buying in affected communities. Activity was booming in Chappaqua by 1928, 12 years before the parkway arrived. In April 1928, the *New Castle Tribune* cited "remarkable development," including new estates in outlying areas and modest homes in subdivisions near the railroad station. Lumber sales doubled from the previous year and lands of the former Greeley estate opposite the railroad sold for an average of $7,500 an acre.

Road improvements had come to Chappaqua 15 years earlier with the rebuilding of the Crystal Springs-Chappaqua-Millwood Road (Route 120) as a state highway. According to the *New Castle Tribune*, this work had been accomplished through the efforts of Town Supervisor Howard Washburn to fulfill a campaign promise. Initially denied the highway by the County Board of Supervisors and State Highway Commission, Washburn had invoked the assistance of Tammany Hall leader Charles Murphy, explaining how the highway would benefit New York city motorists frequenting the Westchester countryside. Murphy in turn pressured the State Highway Commissioner who approved the road. The highway was completed in 1912.

At Chappaqua, the Crystal Springs-Millwood highway crossed the Harlem Railroad via King Street. Located at the village center, this was a busy crossing made busier by the state highway improvement and by the activity spawned by the Saw Mill River Parkway. Poor visibility around encompassing buildings put automobiles, horse teams, and pedestrians at risk, and with many resulting accidents, King Street became a candidate for replacement in the 1920's under the New York State Railroad Grade Crossing Elimination Program.

Initiated in 1897, the Grade Crossing Elimination Program was part of a national effort to separate railroads from congested highway crossings both for safety and to expedite the flow of traffic. A steady increase in automobiles brought a corresponding rise in rail crossing accidents in the first quarter of the twentieth century, yet, the progress was slow to get rolling due to sporadic funding by the state. Progress came in 1923, after the death of nine people in an accident in Chautauqua County spurred Governor Alfred E. Smith to take action. The governor proposed a state lending program that would make the work affordable to the state, railroads, and local municipalities, and with wide public and political support, the program came to fruition under the Grade Crossing Elimination Amendment of 1925 and the Grade Crossing Elimination Act of 1926. A final hurdle was removed under Laws of 1928 and 1929, which relieved local municipalities of all but 1% of their share of construction costs.

In 1930, the State Public Service Commission proposed the elimination of 299 grade crossings in New York State including all but one of the New York Central Railroad Harlem Division crossings in Westchester County. The King Street crossing at Chappaqua was the first of the Westchester group to be eliminated. Town Supervisor Howard Washburn had convinced the New York Central engineers of the urgency of the Chappaqua site during initial planning in 1926, stressing the advancing development and growing land values at Chappaqua, which he argued, would soon hinder the railroad's ability to complete the project.

The Westchester Park Commission previously had approved a bridge to carry the state highway over the Saw Mill River Parkway at Chappaqua. With approval of the grade crossing elimination, the parkway and railroad bridges would be combined on a new alignment south of King Street (Quaker Road), extending between South Greeley Avenue and the old intersection of King Street and Pines Bridge Road. A third span east of the railroad bridge would cross Allen Place, a new access road built between King Street and the rail station.

*Bridge History*

The Route 120/Metro North Railroad Bridge was designed by Jay Downer, Chief Engineer of the Westchester Park Commission, in conjunction with the New York Central Railroad Engineering Department.

Downer, architect of the Westchester parkway aesthetic, selected an arched, rustic stone design, compatible with the adjacent Saw Mill River Parkway bridge. The *New Castle Tribune* credits Howard Washburn with influencing Downer to use stone facing, instead of plain concrete, to make the bridge more attractive. The proximity of the bridge to the railroad station, also a rustic stone structure, was likely an influencing factor in the final bridge design.

The bridge used a rigid steel frame, a design pioneered by Arthur G. Hayden for earlier grade crossing eliminations and for bridges on the Bronx River Parkway. This type of bridge distributed the horizontal load through a unified arched frame, allowing the use of more efficient (shallower) spanning girders than in a traditional beam bridge. The lighter arched girders allowed greater clearance, saved on material costs, and created a graceful, attractive profile. The steel frame bridge was widely used for parkways where low clearance, cost, and aesthetics all came into play, including the Bronx River Parkway, the Merritt Parkway, the Taconic State Parkway, and the Saw Mill River Parkway.

The Route 120/Metro North Bridge was built by the P. T. Cox Contracting Company of New York City under Public Service Commission Case No. 4103, Chapter 774, Laws of 1926. The contracts for land acquisition and construction were let in 1927, 1929, and 1930. Work began on March 26, 1929, when "the first steam shovel appeared on the scene and plunged its steel jaws into the moist earth in the heart of Chappaqua" (*New Castle Tribune*, August 28, 1930). The final cost of $484,161.50, for the land, construction and approaches, was apportioned 50% to the New York Central Railroad, 49% to the State of New York, and 1% to the Town of New Castle. This cost included the adjacent parkway bridge, which was built by the P. T. Cox Company under a separate contract.

The Route 120/Metro North Bridge was formally opened at the Chappaqua bicentennial celebration held September 6, 1930. A visible symbol of progress for the village, the bridge became the center piece of the celebration. After the ribbon was cut by nine-year old Mary Ross Larson, the head of the festival parade proceeded onto the bridge for the dedication. A crowd of 15,000 gathered around to hear addresses by Arthur Lawrence, President of the Westchester Park Commission, R. E. Dougherty, Vice-President of the New York Central Railroad, and George Lunn, former Lieutenant Governor of New York State. Lunn orated, "In the Bridge we have an instance of what we try to do in order to guard the lives of our people. There is no more beautiful one than this in the State of New York and you have fittingly opened it by celebrating the occasion with the 200th Anniversary of the founding of Chappaqua and the settlement of this village" (New Castle Tribune, September 8, 1930).

The merits of the bridge perhaps were best praised in a New Castle Tribune editorial several days before the celebration:

> It was a joyful day in Chappaqua Tuesday when the King Street grade crossing
> elimination bridge was opened. A little inconvenient perhaps at first it is such a
> boon that no complaints of this sort are in evidence. We may well sing, no more
> crossings, no more accidents, and no more nerves at the crossing. The bridge is
> there in all its fine masonry, a monument to the progress and a safeguard to
> posterity. Lives are to be saved, worry is to be spared, and trains will roar by as
> they please....We must not pass this significant point in Chappaqua history
> without pausing for one moment of meditation. Let there be a thought for those
> who did not cross the crossing unscathed-we mean the living and their
> memories. To them all respect and consideration at this time.   Chappaqua
> received its bridge none too soon.  Other communities will wait for years for
> theirs. For this one reason we should be glad, that we do not have to wait longer
> (New Castle Tribune, September 4, 1930).

SR 120 / Metro-North RR Bridge
(Page 6)

Chappaqua would continue to grow over the next decade, with the Saw Mill River Parkway finally arriving in 1940. More dramatic development followed WW II and continued into the 1970's, with the railroad and the parkway playing central roles for commuters living there. The railroad has been operated by the railroad Metro-North Railroad, a subsidiary of the New York State Metropolitan Transportation Authority, since 1983. Chappaqua remains a vital and desirable community today with notable citizens residing there.

The Route 120/Metro North Railroad Bridge remains in service 75 years after its completion. A highly visible and attractive structure the bridge is a symbol of an important era in Chappaqua's history. The bridge reflects the influence of both the Saw Mill River Parkway and the Harlem Railroad on the transformation of Chappaqua to a suburban community, and also the underlying efforts made by Town Supervisor Harold Washburn in the interest of local citizens.

SR 120 / Metro-North RR Bridge
(Page 7)

## SOURCES OF INFORMATION

**Engineering Drawings**

New York Central Railroad Buffalo and East Harlem Division,
Elimination of Grade Crossing Main Street & Birdsall Road, .068 miles north of Chappaqua. Public Service Commission Case 4103. General Plan, Architectural Details, Structural Details, Masonry Details, Foundation Plans, Electrical Conduits for Lighting, October-November, 1928. New York State Department of Transportation Design Division, Record Plans Office, 50 Wolf Road, Albany.

Westchester County Park Commission,
Saw Mill River Parkway, Main St. Chappaqua N.Y. Contract No. 158. Structural Details, July 1928. New York State Department of Transportation Design Division, Record Plans Office, 50 Wolf Road, Albany.

**Historic Views**

Photograph. View of the railroad overpass looking north. Photographer unknown, 1930. New Castle Historical Society, Chappaqua, N.Y.

**Bibliography**

Beers, J. B.
*County Atlas of Westchester, New York.* J. B. Beers & Co., New York, 1872.

Connecticut Department of Transportation,
"Merit Award: Reconstructed. Merritt Parkway over Route 123, Norwalk, Connecticut." *Modern Steel Construction,* July 2000.

Hayden, Arthur G., et al.
*The Rigid-Frame Bridge.* John Wiley and Sons, Inc., New York, 1931.

Jobson, Sandra D.,
*Section 106 National Historic Preservation Act Finding Documentation.* Route 120 over Metro-North Railroad Bridge, Route 120 at Hunts Place Intersection, Hamlet of Chappaqua, Westchester County - NYSDOT PIN 8026.08.101. New York State Department of Transportation, Poughkeepsie, N.Y., December 2, 2005.

Marston, Christopher, and Davis, Tim
"Commissioners and Staff," *Bronx River Parkway Reservation.* Historic American Engineering Record, HAER NY-327. http://www.westchesterarchives.com/BRPR/Report_fr.html (accessed May 19, 2006).

Roth, Matthew,
*Merritt Parkway Bridge No. 744.* Historic American Engineering Record, HAER CT-55, Written Historical and Descriptive Data. Prepared for the Connecticut Department of Transportation

Mead & Hunt, Inc., and Allee King Rosen & Fleming, Inc.,
*Evaluation of National Register Eligibility, Task C3 of the Historic Bridge Inventory New York State Department of Transportation Historic Bridge Database.* Prepared for the New York State Department of Transportation and the Federal Highway Administration, January 2002.

SR 120 / Metro-North RR Bridge
(Page 8)

SOURCES OF INFORMATION
(Continued)

Mead & Hunt, Inc., and Allee King Rosen & Fleming, Inc., *Contextual Study of New York State's Pre-1961 Bridges*. Prepared for the New York State Department of Transportation, November, 1999.

*Metro-North Railroad*. http://www.mta.nyc.ny.us/mnr/html/faqs.htm (accessed May 16, 2006).

*New Castle History*. Excerpts from *A Bicentennial History of the Town of New Castle, 1791-1991*. http://www.newcastle-ny.org. (accessed May 16, 2006).

*New Castle Tribune*,
"New Bridge Here Will Aid Future Planning of Town." 19 April, 1928. Chappaqua, N.Y.

————, "Keynote of Chappaqua's Growth." 19 April, 1928. Chappaqua, N.Y.

————, "Gates And Fence Bar King Street Crossing Forever." 28 August, 1930. Chappaqua, N.Y.

————, "Grade Crossing Is Closed." 28 August, 1930. Chappaqua, N.Y.

————, "Pictures of the Grade Crossing Elimination Bridge Now Open." 4 September, 1930. Chappaqua, N.Y.

————, "Over Fifteen Thousand People Attend Chappaqua 200th Anniversary Celebration Saturday." 11 September, 1930. Chappaqua, N.Y.

————, "Board Discusses Lighting of Elimination Span." 11 September, 1930. Chappaqua, N.Y.

New York Central Railroad. http://www.danceage.com/biography/sdmc_New_York_Central_Railroad (accessed May 16, 2006).

New York State Department of Audit and Control,
*Railroad Grade Crossing Elimination Payment Registers, 1927-1960*. New York and Harlem Railroad Elimination of Grade Crossings Main Street and Birdsall Road, Public Service Case No. 4103. New York State Archives (B0604), Cultural Education Center, Albany, N.Y.

New York State Department of Highways,
*Plans for Improving the Crystal Springs - Chappaqua - Millwood County Highway* (SH 1015). New York State Department of Highways, 1912.

New York State Department of Transportation,
*Historic Bridge Database*, prepared by Mead & Hunt, Inc., 2002.

Sanborn Map Company,
*Insurance Maps of Chappaqua,, N.Y.* Sanborn Map Company, New York, 1925, 1939.

*Saw Mill River Parkway*. http://www.nycroads.com/roads/saw-mill/ (accessed May 16, 2006).

Stein, Geoffrey,
"The Grade Crossing Problem in New York State," in *A Great Day for Elmira*. The New York State Museum and the Chemung County Historical Society, Albany, N.Y., in press.

SOURCES OF INFORMATION
(Continued)

Warner, Leonard, and LaFrank, Kathleen,
      *Taconic State Parkway.* Historic American Engineering Record, HAER NY-316, Written Historical and
      Descriptive Data: 9-10.

Weingold, Marilyn E.,
      *Pioneering in Parks and Parkways: Westchester County, New York, 1895-1945.* Public Works Historical
      Society, Chicago, 1980.

Wood, Henry,
      "Chappaqua Moves Ahead In an Unhurried Progress." *New Castle Tribune.* 19 April, 1928. Chappaqua,
      N.Y.

SR 120 / Metro-North RR Bridge
(Page 10)



Area of Detail

Bridge Location

NEW YORK STATE

Westchester County



Figure 1. Route 120 / Metro-North Railroad Bridge Location in Westchester County



Figure 2. Route 120 / Metro-North Railroad Bridge Location on *Ossining* 7.5' USGS quadrangle (1967).

SR 120 / Metro-North RR Bridge
(Page 12)





Figure 3. 1872 *County Atlas of Westchester* (Beers)
Chappaqua was a small village clustered around the Harlem Railroad crossing (King Street) in the
late nineteenth century (greencircles). The Route 120 grade crossing elimination bridge was built
south of this crossing (red square).

SR 120 / Metro-North RR Bridge
(Page 13)



Figure 4. 1925 *Insurance Map of Chappaqua, N.Y.* (Sanborn Map Company)

The construction of the New York Central Railroad passenger depot (blue circle and photo insets) in 1902 ushered in an era of suburban growth in Chappaqua, heightened by expectation of the Saw Mill River Parkway in the 1920's. Note many platted building lots south of King Street and east of the railroad. Accidents at the busy King Street railroad crossing (green circle) led to the construction of the Quaker Road (Route 120) grade crossing elimination bridge in 1930, shown at center.

SR 120 / Metro-North RR Bridge
(Page 14)



Figure 5. 1939 *Insurance Map of Chappaqua, N.Y.* (Sanborn Map Company)

The Quaker Road (Route 120) grade crossing elimination bridge (red circle) was built on a new alignment south of former King Street crossing (green circle). The bridge for the Saw Mill River Parkway was completed at the same time, however, the parkway did not reach Chappaqua until 1940.

HISTORIC AMERICAN ENGINEERING RECORD
INDEX TO PHOTOGRAPHS

State Route 120
Spanning Metro-North Railroad and Allen Place
Hamlet of Chappaqua / Town of New Castle
Westchester County
New York

Field Photographer: Gregory Troup                                    April 2006

FIELD PHOTOGRAPHS

Photo 1    View northwest from South Greeley Avenue

Photo 2    East end, view Northwest

Photo 3    West end, view southeast

Photo 4    North side, view southwest

Photo 5    South side, Allen Place span, view northeast

Photo 6    South side, railroad span, view northeast

Photo 7    South side and underside of Allen Place span, view northeast

Photo 8    South side and underside of railroad span, view north

Photo 9    South side stairway, view northwest

Photo 10   Southwest stairway, view north

Photo 11   Bridge entry to north side stairway, view northeast


DOCUMENT PHOTOGRAPHS

Photo 12   Digital photo from photograph
           (Photograph at New Castle Historical Society, Chappaqua)
           1930, photographer unknown
           View of the railroad overpass looking north.

Photo 13   Photocopy reduction from microfilm
           New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
           Crossings Main Street & Birdsall Road, October 2, 1928
           Sheet 1 of 12: General Plan

Photo 14   Photocopy reduction from microfilm
           New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
           Crossings Main Street & Birdsall Road, October 2, 1928
           Sheet 2 of 12: Architectural Details

# INDEX TO PHOTOGRAPHS
(continued)

Photo 15      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 3 of 12: Architectural Details

Photo 16      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 4 of 12:  Architectural Details

Photo 17      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 5 of 12:  Masonry Details

Photo 18      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 5A:  Foundation Plans

Photo 19      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 6 of 12: Structural Details

Photo 20      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 7 of 12:  Structural Details

Photo 21      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 8 of 12:  Masonry Details

Photo 22      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 9 of 12:  Masonry Details

Photo 23      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 10 of 12:  Masonry Details

Photo 24      Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 11 of 12:  Masonry Details

INDEX TO PHOTOGRAPHS
(continued)

Photo 25    Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, October 2, 1928
Sheet 12 of 12:  Masonry Details

Photo 26    Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, November 14, 1928
Sheet 1 of 2:  Electric Conduits for Highway Bridge Lighting,

Photo 27    Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad, Elimination of Grade
Crossings Main Street & Birdsall Road, November 14, 1928
Sheet 2 of 2:  Electric Conduits for Highway Bridge Lighting,

Photo 28    Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad
Elimination of Grade Crossings Main Street & Birdsall Road, November 24, 1928
Sheet 1 of 2: Specifications for Electric

Photo 29    Photocopy reduction from microfilm
New York Central Railroad Harlem Division New York & Harlem Railroad
Elimination of Grade Crossings Main Street & Birdsall Road, November 24, 1928
Sheet 2 of 2: Specifications for Electric

Photo 30    Photocopy reduction from microfilm
Westchester County Park Commission Saw Mill River Parkway
Main St. Chappaqua N.Y., July 23, 1928
Sheet 4 of 6: Structural Details

Photo 31    Photocopy reduction from microfilm
Westchester County Park Commission Saw Mill River Parkway
Main St. Chappaqua N.Y., July 23, 1928
Sheet 5 of 6: Structural Details of Approach Walls & Layout of Electrical Conduits

Photo 32    Photocopy reduction from microfilm
Westchester County Park Commission Saw Mill River Parkway
Main St. Chappaqua N.Y., July 23, 1928
Sheet 6 of 6: Structural Details of Approach Walls

## HISTORIC AMERICAN ENGINEERING RECORD
### KEY TO PHOTOGRAPHS



**KEY**

|  |  |
|---|---|
| ▓ | Route 120 / Metro-North RR Bridge |
| ▓ | stairways |
| ∠ | 2006 Field Photos 1-11 |
| ◯ | 1930 Photo 12 |



Photo 1.  View northwest from South Greeley Avenue.
The Route 120/Metro North Railroad Bridge is located at the top of the rise.



Photo 2. East end of the Route 120 / Metro-North Railroad Bridge, view northwest. Note stone faced parapet walls with granite capstones



Photo 3.  West end of the Route 120 / Metro-North Railroad Bridge, view southeast.

The railroad bridge west approach is marked by the paired low stone columns and wooden fences at center, with the actual bridge beyond marked by light posts.  The walls in the foreground flank the Route 120 / Saw Mill River Parkway Bridge, originally built under a separate contract.



Photo 4.  North side of the Route 120 / Metro-North Railroad Bridge, view southwest on Allen Place. The Metro-North Station is visible in the distance.



Photo 5. South side o f the Allen Place span, view northeast.



Photo 6. South side of the railroad span, view northeast.



Photo 7. South side and underside of the Allen Place span, view northeast.



Photo 8. South side and underside of the railroad span, view north.



Photo 9. South side center stairway, view northwest.



Photo 10. Southwest stairway, view north. Note original cast iron light posts at bottom and center landings, with replacement post at the top landing.



Photo 11. North side stairway top landing, view northeast. The lamp posts are recent replacements.



Photo 12.  1930 View of the railroad overpass looking north.  Photographer unknown.
Photograph appears to have been taken at the formal opening of the bridge during Chappaqua's bicentennial
celebration (New Castle Historical Society).  The area in the foreground was dedicated as H. L. Smith Park.



The University of the State of New York
The New York State Education Department
Albany, N.Y. 12230

# EXHIBIT B

# GRAY WILLIAMS

### 32 Gray Rock Lane • Chappaqua • New York 10514 • (914) 238-8593

April 11, 2007

Ms. Janet Wells, Supervisor
Town of New Castle
200 South Greeley Avenue
Chappaqua, New York 10514



Dear Ms. Wells:

In its report to the New York State Department of Transportation, the Cultural Resource
Survey Program of the New York State Museum states the following:

> The Route 120/Metro-North Railroad Bridge is significant as a highly visual
> example of a rigid steel frame bridge in Westchester....The bridge is also significant
> as an historic symbol of progress for Chappaqua, opened as the centerpiece of the
> village centennial celebration in 1930....

> The New York State Department of Transportation has determined the
> Route120/Metro-North Railroad Bridge to be unsafe for vehicular traffic due to
> serious deterioration....The Department of Transportation has proposed removal,
> rather than rehabilitation, of the bridge....The Department of Transportation has
> requested this Level II Historic American Engineering Record documentation to
> mitigate the adverse effect to the bridge resulting from its removal.

The members of the Landmark Advisory Committee have reviewed this report, and we
concur that the railroad bridge is indeed of historic significance. We also believe that
efforts should be made to mitigate the effects of replacing the bridge, by retaining as
many of the visual elements of the original structure as possible.

The bridge that passes over the Saw Mill River Parkway, the railroad, and Allen Place is
in fact a sequence of two bridges. Both were designed by the same engineering office and
were constructed at the same time. But the designs of each were quite different. The
bridge over the parkway was designed to harmonize with the other bridges of the
parkway system; its steel-and-concrete framework was sheathed in rough-surfaced stone
to give it a rustic, traditional look, further reinforced by its relatively high parapet walls
on either side of the roadway. The spans over the railroad and Allen Place, by contrast,
were designed to be of exposed steel, innovatively engineered to have as little bulk as
possible. Instead of stone parapets, low steel fences were used to edge the roadway and
sidewalks.

To give some sense of continuity to the two bridges, the concrete abutments of the
railroad bridge were sheathed in the same stone as the parkway bridge, and the same
lighting stanchions were employed for both. But the visual experience of each differs
greatly. This difference is especially striking as you approach the village. First you pass

Janet Wells, Supervisor, April 11, 2007, page 2

through the enclosed corridor between the parapets of the parkway, and then, quite abruptly, the walls end and the whole downtown becomes visible before you. The bridge serves as a dramatic gateway to the village center.

The present plan for the railroad and Allen Place bridge replacement already contains some elements that replicate the original, such as the arched steel girders, the light stanchions, and the stone-sheathed abutments. But in two important ways, the new design departs significantly from the old. First, the open steel fences have been replaced by stone-faced parapets similar to those on the parkway bridge, and, like them, walling off much of the view to either side. Second, a high fence with closely spaced uprights has been added to the section of the bridge that passes over the railroad, further blocking the view and reinforcing the enclosed impression created by the parapets.

These changes also adversely affect the views of the bridge from the north and south. The original steel spans were designed to look light and airy. Adding heavy stone parapets completely contradicts the intended effect. And the high fence over the railroad produces a cage-like effect that is incongruous and out of scale with the original bridge.

We believe that any serious effort to mitigate the adverse effects of removing the original historic bridge must begin with modifying these two elements. First and foremost, we would recommend that the stone parapets be replaced with steel barrier rails, as low and as light as possible. Second, the additional fence over the railroad should be reduced in height, if not removed entirely. Incidentally, we think it worth considering that the present bridge has been in use for three quarters of a century without any serious accident or act of vandalism, and that the exposed and highly visible location of the bridge in this particular community greatly reduces the risk of vandalism.

There are some other, lesser things that might be done to help preserve the visual aspects of the original bridge. Every effort should be made to match the stone of the original abutments in their replacements, and we recommend that as many as possible of the original stone caps and facings be salvaged and reused. The reinforcing ribs of the original steel girders constitute a significant element of their engineering, and we would like to see them reproduced in the new girders. We also recommend that all the exposed steelwork be painted the same traditional grey-green color as it is now.

We understand that there may be a pedestrian stairway from the bridge directly to the railroad platform. We recommend that such a bridge be designed in a style compatible with the bridge and the other stairways from it, rather than in the style of the present pedestrian overpass. We also recommend that both the stairways now in use be replaced, and that the third, unused stairway be removed and its former entrance on the bridge faced in stone.

Ever since 1930, The Quaker Street bridge has been a major focal point of Chappaqua – a centerpiece of its downtown. It was considered a model of innovation and progress when

Janet Wells, Supervisor, April 11, 2007, page 3

it was first opened, and over the decades it has become a familiar and well-loved landmark. We recognize that replacing the part of it over the railroad and Allen Place require meeting basic current safety standards. Nevertheless, we believe that efforts should be made to preserve what we can of this important part of our heritage. We hope that the Town Board agrees, and will support these recommendations in negotiating with the State Department of Transportion.

Sincerely,

Gray Williams

Gray Williams
New Castle Landmark Advisory Committee

# EXHIBIT C

fox/20/2012 213 5030
Jpericoni @ periconi.com

# Section 106 National Historic Preservation Act

DEC - 8 2005



*Historic Postcard of NY Central RR Station, Chappaqua, NY*

# Finding Documentation

Route 120 over Metro-North Railroad Bridge
Route 120 at Hunts Place Intersection
Hamlet of Chappaqua, Town of New Castle
Westchester County

### NYSDOT PIN 8026.08.101
### OPRHP PR# TBD

*Prepared by Sandra D. Jobson, RLA, AICP*
*New York State Department of Transportation, Region 8 Cultural Resource Coordinator*
*As delegated by the Federal Highway Administration (FHWA)*

December 2, 2005

## 1.    **Project Description**

This project is located in the Hamlet of Chappaqua, in the Town of New Castle,
Westchester County. The land use within the project area is mostly commercial.
Refer to Appendix A for a project location map.

The project consists of the replacement of the Route 120 Bridge (BIN 1037350)
over the Metro-North Railroad (MNRR) as well as the resurfacing of Route 120
from the bridge, west to Route 120's intersection with Hunts Place. Additionally,
an improved right-turn lane will be added to the intersection of Route 120 with
Hunts Place.  Refer to Appendix B for project plans and Appendix C for photos
of the Route 120 Bridge over MNRR.

The primary objectives of this project are to:

- Provide a safe, non-deficient structural condition at Route 120 over the
  Metro-North Railroad (BIN 1037350) for at least 30 years using cost-
  effective techniques to ensure adequate vehicular and structural capacity,
  and minimize maintenance and repair, and environmental impacts.

- Improve overall traffic conditions for traffic flow and facilitate traffic
  operation, using cost-effective methods to reduce delay and to provide an
  acceptable level of service, for a design period of 30 years minimum.

- Improve the highway geometric elements, including the elimination of
  non-standard features were possible, and incorporate appropriate design
  features (i.e. traffic calming measures) to safely accommodate bicycle and
  pedestrian access and ensure ADA compliance.

- Develop a properly scaled Maintenance and Protection of Traffic Plan to
  safely accommodate traffic movements, pedestrians, and bicyclists,
  maintain adequate access to local business, and adequately accommodate
  the Metro-North Railroad operations.

The project is federally funded and is being progressed as a NEPA Class II project
and a SEQRA Type II action.

## 2. Steps Taken to Identify Historic Properties

A site visit was completed in 1994 by the New York State Department of Transportation (NYSDOT), Region 8 Cultural Resource Coordinator and NYSDOT Main Office staff from the Environmental Analysis Bureau (EAB) to perform a preliminary review of the bridge's eligibility. At that time, it was recommended by EAB staff that the Route 120 Bridge over the MNRR was potentially eligible for inclusion on the National Register of Historic Places in a memo dated June 8, 1994.

The project was put on hold for several years while the Town of New Castle completed a Comprehensive Plan in the project area. During this time, the bridge conditions worsened and the project scope increased due to increased deterioration of the bridge. A subsequent site visit by NYSDOT regional staff and State Historic Preservation Office (SHPO) staff was made in March 2005 to review the project once again. At this time, it was confirmed by Ken Markunas, SHPO, that the structure is eligible for inclusion on the National Register of Historic Places; NYSDOT regional staff concurred.

In 2005, the project was expanded to include intersection work to the west of the bridge at the intersection of Route 120 and Hunts Place at the request of the community. The intersection work requires minor right-of-way takings; consequently a Cultural Resource Survey (archeological and architectural) was requested. A final report, based on field investigation by the NYS Museum's Cultural Resource Survey Program, dated September 19, 2005, recommended no further investigation.

Adjacent the Route 120 Bridge over the MNRR is the Chappaqua Train Station and Depot Plaza which is listed on the National Register of Historic Places. The state currently has a permanent easement at the southeast corner of the bridge, on the Chappaqua Train Station and Depot Plaza property, for the bridge approach embankment side slope. The replacement bridge will continue the use of the permanent easement and will retain the existing embankment side slope. To facilitate the 10' widening on the south side of the bridge, a small retaining wall will be built with the top of wall elevation equal to the roadway elevation. The wall will have a maximum height of 15', and taper down to 3' and will run approximately 25' in length from the bridge abutment east. The work along Railroad Street, under the bridge, is limited to paving and construction access. All work proposed along Railroad Street is fully contained within right-of-way owned by the state.

Based on the information above, the Area of Potential Effect (APE) is defined as the area encompassed by the National Register of Historic Places eligible bridge; Route 120 over MNRR (BIN 1037350), refer to Appendix B for APE boundary.

## 3.   Evaluation of Project Impact on Identified Historic Properties

| Property Name and Address | Contributing Setting/Landscape Features | Proposed Work | Impacts |
|---|---|---|---|
| Route 120 over the Metro-North Railroad (BIN 1037350) | Constructed in 1930 with stone covered wingwalls/ stairways and period lighting and rail. | Replace the existing structure. Widen from 2 lanes to 3 lanes to accommodate a turning lane on bridge. | Deficient bridge requires widening to the south; consequently the bridge will need to be replaced. |
| Chappaqua Train Station and Depot Plaza | Stone faced station and plaza, constructed in 1902. | Replace the existing bridge adjacent the plaza and continue use of existing permanent easement. | The existing side slopes will remain the same and a 15-3' high wall will run 25' in length from the bridge abutment east. |

## 4.   Basis for Recommended Project Finding

The Criteria of Adverse Effect (36CFR Part 800.5) was applied to the historic properties within the APE. Sandra Jobson, the Cultural Resource Coordinator for the New York State Department of Transportation, Region 8 office, completed the effect determination in coordination with Clark Patterson Associates, engineering consulting firm.

In applying the criteria of effect in accordance with Section 800.5(b) of 36CFR Part 800, we find this undertaking will have an *Adverse Effect*.

The Route 120 Bridge over the MNRR (BIN 1037350) was built in 1930 to eliminate an at-grade intersection between Route 120 and the Saw Mill River Parkway. The bridge was determined eligible for the National Register of Historic Places by EAB staff in 1994 and confirmed by SHPO staff in 2005. Due to numerous factors outlined below the eligible bridge will require complete replacement.   A Memorandum of Agreement (MOA), stipulating the necessary and agreed upon mitigation, will be executed between the SHPO, NYSDOT and FHWA. Preliminary mitigation measures for this *Adverse Effect* have been explored by NYSDOT regional staff and SHPO. Preliminary mitigation measures include HABS/HAER documentation, design replacement structure to be similar in form to existing bridge (stone faced, haunch steel beams) and incorporate existing historic lamp posts and fixtures into bridge replacement design.

Alternatives that would have avoided the *Adverse Effect* and included rehabilitation as a viable alternative were dismissed for the following reasons:

i.   Structural and Other Deficiencies: The subject bridge is at the top of NYSDOT Region 8's list of structurally deficient bridges and is currently number one on the list replacement priorities. According to the July 26, 2004

Biennial Inspection Report, the bridge has a General Recommendation of 3 (rating indicative of Serious Deterioration). The bridge was built in 1930 and the need for repairs was highlighted in 1994 when five "Safety Flags" were issued for cracked, loose, and delaminated concrete on the underside of the deck in both spans. In 1996, the continuing NYSDOT Bridge Inspection program reported deficiencies in the deck, curbs, wearing surface, primary members (Span 1), and pedestals. An in-depth inspection performed in 1999 confirmed these reports. The latest Biennial Inspection (July 2004) identified the following deficiencies:

- Concrete curb has cracks, scaling along the top edge, and spalls.
- The concrete sidewalk has severe spalls and cracks. Repair patches are failing, resulting in tripping hazards to pedestrians. A Safety Flag was issued because of the tripping potential.
- The existing steel bridge railing is heavily corroded. Posts are detached from the rails at several locations. The railing does not move when leaned upon, but it will not be able to withstand any impact without toppling over.
- The steel railing of the stairways from each side of the bridge are also loose due to rust development over the years.
- The underside of the structural deck exhibits random map cracking, transverse cracking, efflorescent leaking and stalactite formations due to extensive leakage through the top. There are other areas on the underside of the deck where the concrete has spalled, exposing reinforcing bars which are now rusted.
- There is up to 25% section loss of the structural steel in Span 1. See Note #2 below for further details.
- The paint system has failed as evidenced by the extent of rust and deterioration of the exposed and unprotected steel.

ii.  Structural Configuration: The existing superstructure is comprised of four rigid steel frames in each of the 2 spans. The vertical legs of the frames are encased in the concrete abutments and pier. Much of the documented deficiencies related to the structural steel are located at the interface between the steel and the concrete. These deficiencies include moderate to heavy corrosion of the structural steel members with rust delamination at the bottom flanges and the insides faces of the fascia beams in Span 1 for the entire length of the span. The inside web stiffeners of both fascia girders are heavily corroded with some rust-through holes located primarily at the girder ends and extending towards mid-span. The total section losses due to corrosion are estimated as 15 to 20% at the web and up to 25% at both top and bottom flanges with the most severe section losses being located at the beginning and ending of the span, at the interface with the concrete abutment and pier respectively. The location of these deficiencies makes it difficult to assess the magnitude of the problem because steel is hidden inside the concrete encasement, but more importantly, will be very difficult to repair under a

rehabilitation contract. In addition, the steel frames are made of riveted sections, which is also very difficult to rehabilitate. Existing rivets are often difficult to remove because they are very old and rusted tight to the base steel. Damage to the base metal can occur when attempting to remove the rivets. At many types of riveted connections, literally dozens of rivets will need to be removed to simply replace or repair one small gusset plate.

iii.    Cost: The estimated cost to rehabilitate the bridge is approximately $2.5 million, which is over 60% of the estimated replacement cost of $4.0 million.

iv.    Detailed traffic studies of the highway system in the project area have determined that a right turn lane is needed across the bridge for eastbound Quaker Road traffic turning right on to South Greeley Ave. The existing bridge section has one through lane in each direction, with no available space for the additional lane that is needed. The configuration of the structural deck, curb, sidewalk, etc. does not lend itself to widening.

v.    Many of the work elements that would be required under a rehabilitation alternative would be difficult and/or expensive, including, but not limited to:

- The vertical curtain walls that make up the face of each abutment and pier are essentially concrete lagging walls which retain the backfill. These curtain walls are supported by the flanges of the vertical legs of the steel frames. Any rehabilitation work that may require repairs to the curtain wall and/or the steel behind would be difficulty as the backfill would need to be removed first. This type of operation would also require some type of longitudinal sheet piling along the construction line in order to maintain vehicular traffic. Depending on the location of bedrock, a cantilevered sheet pile wall may not even be feasible for this work. (See sketches at the end of document.)
- The steel frame behind the curtain walls are encased 3" of concrete. Any necessary repairs to the steel in these areas would require removal of the concrete before any work could be completed. (See sketches at the end of document.)
- Cleaning and painting of the structural steel – The existing concrete blast protection in the Metro-North span is loose, falling to the tracks and to the loading/unloading platform. The blast protection is no longer needed with the electric trains that use this line. This blast protection needs to be removed in its entirety. Remaining material is often difficult to remove without causing damage to the structural steel. Other structural steel is painted with lead based paint, which is extremely expensive to remove. The entire superstructure needs to be encapsulated in order to catch all of the lead paint as it is removed. This operation becomes even more difficult (and expensive) when working over a live and extremely active commuter railroad.

- The steel repair that would be needed to correct the deficiencies noted in Item #2 above will be very costly. Both fascia members in Span 1 will essentially need to be replaced. Since the structure is a 3-sided rigid steel frame, the horizontal beam will need to be disconnected from the vertical legs of the frame and replaced. Matching the new horizontal steel into the existing vertical legs will be very difficult because of the riveted connections. All of the holes will need to align exactly. The rivets would be replaced with high strength bolts.
- The riveted configuration of the structure consists of several layers of plates and angles all held together with rivets. These types of built up members are subject to susceptible to what is known as crevice corrosion, whereby rust builds up between the angles and plates between the rivet connections. As the rust builds up, the plates bulge, resulting in a ripple-like effect along the member. The result is section loss and overstress of the member. These types of problem will persist on this structure under a rehabilitation alternative.

vi.  During construction, two-way traffic will need to be maintained at all times. The existing bridge section is not wide enough to be able to carry two-way traffic during construction without making modifications to the structure and removing the sidewalks (to make room for the temporary travel lanes). Pedestrian traffic would not be able to be maintained on the bridge. In addition, the approach geometry and the close proximity of the Route 120 Bridge over the Saw Mill River Parkway will add to the complexity. The required lane shifts required for the MPT layout under the rehabilitation alternative would not meet minimum standards. In many cases, tractor trailers would have difficulty driving through the work zone. The reconstruction alternative will present other, more desirable opportunities for lane shifts during the various MPT phases.

Therefore, the preferred alternative, when considering all of the possible impacts, is the replacement of the National Register of Historic Places eligible Route 120 Bridge over the MNRR (BIN 1037350).

## 5.  Public Involvement

Several public meetings have been held with Town officials to discuss the project. Other than the concerns for the retention of the aesthetics of the existing bridge, no cultural resource concerns were raised.

## 6.  Appendix

A.  Project location maps
B.  Project plans
C.  Photographs of Route 120 bridge over MNRR (BIN 1037350)

# Appendix A

# Project Location Maps

JUNE 2005    **PROJECT SCOPING REPORT** .    PIN 8026.08



MAP OF THE
STATE OF NEW YORK

LOCATION
OF WORK

WESTCHESTER COUNTY

**NYSDOT REGION MAP**

RECONSTRUCTION OF NY ROUTE 120
BIN 1037350 OVER METRO-NORTH RR
HAMLET OF CHAPPAQUA
TOWN OF NEWCASTLE
WESTCHESTER COUNTY

| Not to Scale | PIN 8026.08 |
|---|---|

# Appendix B

# Project Plans

ALTERNATIVE NO. 3
OVERALL CONCEPT PLAN

APE
APPROXIMATE
PROJECT AREA

from P.

05/05/08  MON 14:54 FAX 518 233 9049        FIELD SVCES. BUR.                    ☑003



05/06/08  TUE 09:43 FAX 518 233 9049        FIELD SVCES. BUR.                    ☒006

# Appendix C

# Photographs of Route 120 bridge over MNRR (BIN 1037350)



BIN 1037350 – Looking at south side of center pier/stairway from Railroad Street



BIN 1037350 – Looking at north side of center pier/stairway from Railroad Street



BIN 1037350 – Looking at north fascia from Railroad Street.



BIN 1037350 – Looking at south fascia from Railroad Street.

# EXHIBIT D

**New York State Office of Parks, Recreation and Historic Preservation**
Historic Preservation Field Services Bureau
Peebles Island, PO Box 189, Waterford, New York 12188-0189                    518-237-8643

OFFICE OF PARKS
NEW YORK STATE
Bernadette Castro
*Commissioner*

December 15, 2005

Sandra D. Jobson, RLA, AICP
Cultural Resource Coordinator
NYS Dept. of Transportation-Region 8
4 Burnett Boulevard
Poughkeepsie, NY 12603

DEC 2 2 2005
RECEIVED
REGION 8 DESIGN

Re: FHWA/DOT PIN 8026.08.101
    BIN 1037350
    Rt 120 Bridge over Metro
    Chappaqua, Westchester County
    05PR05945

Dear Ms. Jobson:

Thank you for requesting the comment of the State Historic Preservation Office (SHPO). We have had an opportunity to initiate the review of the project in accordance with Section 106 of the National Historic Preservation Act of 1966 and relevant implementing regulations.

Based upon our review of the submitted Finding Documentation, the SHPO concurs with the opinion that the replacement of the subject bridge will result in an **Adverse Effect** upon the property that has been determined to be eligible for inclusion in the National Register of Historic Places. Although the submitted report provides substantial information regarding the difficulty in adapting the existing bridge to the project requirements, we will need more information regarding the proposed replacement before we can help develop an agreement for the project.

Please forward additional project information once the material becomes available. If you have questions, please call me at your convenience. Ext. 3273.

Sincerely,

Kenneth Markunas
Historic Sites
Restoration Coordinator

Cc: Robert Arnold, FHWA
    Daniel Hitt, Main DOT EAB

# EXHIBIT E

_sufisher@cosd.ws_





SUPERVISOR'S OFFICE
JUN   6 2006
TOWN OF NEW CASTLE

**STATE OF NEW YORK**
**DEPARTMENT OF TRANSPORTATION**
**4 BURNETT BOULEVARD**
**POUGHKEEPSIE, N.Y. 12603**

ROBERT A. DENNISON III, P.E.
REGIONAL DIRECTOR

_ervia._
_galinelli — 422_
_yr 2_

THOMAS J. MADISON, JR.
COMMISSIONER

June 2, 2006

RECEIVED
JUN   6 2006
TOWN ADMINISTRATOR
TOWN OF NEW CASTLE

Mr. Kenneth Markunas
Historic Sites Restoration Coordinator
New York State Office of Parks, Recreation and Historic Preservation
P.O. Box 189
Peebles Island
Waterford, New York 12188

> **RE:    PIN 8026.08.101**
> **ROUTE 120 OVER METRO-NORTH RAILROAD**
> **ROUTE 120 AT HUNTS PLACE INTERSECTION**
> **HAMLET OF CHAPPAQUA**
> **TOWN OF NEW CASTLE**
> **WESTCHESTER COUNTY**
> **05PR05945**

Dear Mr. Markunas:

Thank you for your letter dated December 15, 2005 and your agencies concurrence with the
*Adverse Effect* determination for the subject bridge replacement project. As requested in your
December 15, 2005 letter, and to help facilitate the development of a Memorandum of Agreement
(MOA) between the State Historic Preservation Office (SHPO), the Federal Highway
Administration (FHWA) and our Department, we are forwarding the proposed architectural concept
for the replacement bridge at Route 120 over the Metro-North Railroad.

The New York State Department of Transportation (NYSDOT) design team worked with Town of
New Castle public officials, who in turn worked with community groups, to develop and reach
consensus on the attached architectural bridge replacement concept over the past six months. The
replacement bridge's appearance is important to the community for two important reasons:

- The bridge is located in the town center, Hamlet of Chappaqua, in a visually prominent
  location.
- The existing National Register Eligible (NRE) bridge being replaced is aesthetically
  pleasing and the community strongly supports the need for the replacement bridge to be
  equally aesthetically pleasing.



Kenneth Markunas
June 08, 2006
Page 2

Attached is the NYSDOT and community supported architectural bridge replacement concept. The concept mimics many of the historic architectural features that make the existing NRE bridge aesthetically pleasing. Those historic architectural features that will be incorporated in the replacement bridge design include:

- Arched steel beams that mimic the existing NRE bridges built-up steel plate girders.
- Architecturally distinct pedestrian stairways from Railroad Street/Station Plaza to Route 120 that mimic the detailing of the steel superstructure and stone faced piers of the existing NRE bridge pedestrian stairways.
- Stone faced abutments and pier with architectural reveals/pilasters, similar in overall appearance to the existing NRE bridge abutments and pier.
- Refurbished ornamental light fixtures salvaged from the existing NRE bridge.

Based on the information contained in the Finding Documentation report dated December 2, 2005 and the attached architectural concept for the replacement bridge we believe sufficient information is available to begin a MOA between the involved agencies. In summary, measures to mitigate the *Adverse Effect* determination will include HAER documentation and an architectural bridge replacement design comparable with the NRE bridge being lost. Please begin the MOA development process and provide our office with a draft MOA; we will then coordinate the MOA review with FHWA.

If you have any questions, please call me at 845.431.5814 or e-mail sjobson@dot.state.ny.us.

Very truly yours,

Sandra D. Jobson, RLA, AICP
Cultural Resource Coordinator

Attachment

cc:     Robert Arnold, Division Administrator, Federal Highway Administration, NY Division
        Daniel Hitt, NYSDOT, Environmental Analysis Bureau, POD 41
        Nicholas Choubah, Regional Structures Engineer, NYSDOT, Region 8
        Janet L. Wells, Supervisor, Town of New Castle

6

# Route 120 over Metro-North Railroad

## Hamlet of Chappaqua, Town of New Castle, Westchester County



Ornamental Steel Pedestrian Screening (t)

Stone Faced Parapet

Steel Beam (typ.)

Stone Faced
Abutment & Pier

North Elevation

Refurbished Light Fixtures Salvaged
from Existing Historic Structure

Metro-North RR Platform

South Elevation

# Architectural Concept

NYSDOT PIN 8026.08

OPRHP PR# 05PR05945

# EXHIBIT G



U.S. Department
of Transportation
**Federal Highway
Administration**

# Memorandum

Subject:  PIN 8026.08
        Route 120 over MNRR
        Town of New Castle, Westchester County

Date: November 1, 2006

From:   Robert Arnold
        Division Administrator
        Albany, New York

Reply to
Attn. of:  HDO-NY

To:    William Gorton, P.E., Regional Design Engineer
       New York State Department of Transportation, Region 8
       4 Burnett Boulevard
       Poughkeepsie, NY  12603

We have reviewed the final design report dated October 2006 and we have previously visited the site. We agree with the contents of the design report except for Section IV.B.3.f. We are striking the first paragraph which is inaccurate.

Nevertheless, the design report adequately demonstrates that the project meets our Programmatic Section 4(f) Evaluation and Approval for FHWA Projects that Necessitate the Use of Historic Bridges. Based on the design report, the agreement under Section 106, and our field visits, we have determined that there is no feasible and prudent alternative to the use of the Route 120 Bridge over the Metro North Railroad and Railroad Street in the Hamlet of Chappaqua. We have included measures to minimize harm which include a Level III HABS/HAER recording prior to bridge demolition.

We concur with your assessment that this bridge replacement project meets the conditions and criteria of a categorical exclusion since it will not induce significant environmental impacts.

Chris Gatchell
District Engineer

cc:
Director, Design Quality Assurance Bureau, NYSDOT, POD 23



[FOR
App 6 - Correspondence - Act. No. 3 -
Bridge Replacement"]



# MEMORANDUM OF AGREEMENT

### AMONGST THE FEDERAL HIGHWAY ADMINISTRATION, NEW YORK STATE HISTORIC PRESERVATION OFFICE AND NEW YORK STATE DEPARTMENT OF TRANSPORTATION

#### PURSUANT TO 36 CFR SECTION 800

#### REGARDING THE
#### ROUTE 120 BRIDGE OVER METRO-NORTH RAILROAD (BIN 1037350)
#### HAMLET OF CHAPPAQUA, TOWN OF NEW CASTLE, WESTCHESTER COUNTY, NEW YORK

**WHEREAS,** the Federal Highway Administration (FHWA) proposes to replace the Route 120 bridge over Metro-North Railroad in the Hamlet of Chappaqua, Town of New Castle, Westchester County, New York, which has been determined eligible for listing in the National Register of Historic Places, and the New York State Department of Transportation (NYSDOT) has consulted with the New York State Historic Preservation Office (SHPO) pursuant to 36 CFR Part 800, regulations implementing Section 106 of the National Preservation Act (16 U.S.C. 470f); and,

**WHEREAS,** the existing bridge is deficient in providing accepted roadway standards and is structurally deficient. Costly rehabilitation and possible reuse of the bridge would not serve a worthwhile purpose because the bridge can not physically accommodate modern requirements. After considering the documented existing conditions, the limited alternatives and the associated costs, retaining the bridge is not a reasonable alternate, and;

**WHEREAS,** in consultation with Town of New Castle officials, the replacement bridge design will have: arched steel beams that mimic the existing National Register eligible bridges built-up steel plate girders; architecturally distinct pedestrian stairways from Railroad Street/Station Plaza to Route 120 that mimic the detailing of the steel superstructure and stone faced pier of the existing National Register eligible bridge pedestrian stairways; stone faced abutments and pier with architectural reveals/pilasters, similar in overall appearance to the existing National Register eligible bridge abutments and pier, and; refurbished ornamental light fixtures salvaged from the existing National Register eligible bridge.

**WHEREAS,** the FHWA, the SHPO and the NYSDOT acknowledge that the removal of the Route 120 bridge over Metro-North Railroad will result in an Adverse Effect upon the property which has been determined eligible for listing in the National Register of Historic Places.

**NOW, THEREFORE,** the FHWA, the SHPO and the NYSDOT agree that the following stipulation will be implemented in order to take into account the effect of the project on historic properties.

#### STIPULATION

The FHWA, by delegation to NYSDOT, will ensure that the following measures are carried out:

The existing bridge shall be recorded equivalent to HABS Level II documentation standards (plans if available, large format negatives with 8" X 10" prints in report form). Two (2) copies of this documentation shall be prepared in report form and they shall be distributed as follows: one copy to the SHPO (to be forwarded to the State Archives) and one copy to a suitable local repository.

**MEMORANDUM OF AGREEMENT**
**Route 120 Bridge (BIN 1037350) over Metro-North**
**Hamlet of Chappaqua, Town of New Castle, Westchester County**
**NYSDOT PIN 8026.08**
**SHPO 05PR05945**

**EXECUTION AND IMPLEMENTATION** of this Memorandum of Agreement between the NYSDOT, the SHPO and the FHWA, in accordance with 36 CFR 800.6(c), and implementation of its terms provide evidence that the FHWA has taken into account the effect of this undertaking on historic properties and afforded the Advisory Council on Historic Preservation an opportunity to comment.

NEW YORK STATE DEPARTMENT OF TRANSPORTATION

By _____                    Date  $8/17/06$

**MEMORANDUM OF AGREEMENT**
**Route 120 Bridge (BIN 1037350) over Metro-North**
**Hamlet of Chappaqua, Town of New Castle, Westchester County**
**NYSDOT PIN 8026.08**
**SHPO 05PR05945**


**EXECUTION AND IMPLEMENTATION** of this Memorandum of Agreement between the NYSDOT, the SHPO and the FHWA, in accordance with 36 CFR 800.6(c), and implementation of its terms provide evidence that the FHWA has taken into account the effect of this undertaking on historic properties and afforded the Advisory Council on Historic Preservation an opportunity to comment.


NEW YORK STATE PRESERVATION OFFICER

By _____, Deputy SHPO          Date _8/16/06_

**MEMORANDUM OF AGREEMENT**
**Route 120 Bridge (BIN 1037350) over Metro-North**
**Hamlet of Chappaqua, Town of New Castle, Westchester County**
**NYSDOT PIN 8026.08**
**SHPO 05PR05945**

**EXECUTION AND IMPLEMENTATION** of this Memorandum of Agreement between the NYSDOT, the SHPO and the FHWA, in accordance with 36 CFR 800.6(c), and implementation of its terms provide evidence that the FHWA has taken into account the effect of this undertaking on historic properties and afforded the Advisory Council on Historic Preservation an opportunity to comment.

FEDERAL HIGHWAY ADMINISTRATION

By _____                    Date _9/21/2006_

# REVISED SPEED DATA & ANALYSIS SHEET - FORM TE-27
## DEPARTMENT OF TRANSPORTATION - TRAFFIC & SAFETY DIVISION

| SPEED (M.P.H.) | CHECK 1 NO. VEH. %OVER | | CHECK #2 NO. VEH. %OVER | | CHECK #3 NO. VEH. %OVER | | CHECK #4 NO. VEH. %OVER | |
|---|---|---|---|---|---|---|---|---|
| 60 - over | 0 | 0-0 | 0 | 0-0 | | | | |
| 58-59 | 0 | 0-0 | 0 | 0-0 | | | | |
| 56-57 | 0 | 0-0 | 0 | 0-0 | | | | |
| 54-55 | 0 | 0-0 | 0 | 0-0 | | | | |
| 52-53 | 0 | 0-0 | 0 | 0-0 | | | | |
| 50-51 | 0 | 0-0 | 0 | 0-0 | | | | |
| 48-49 | 0 | 0-0 | 0 | 0-0 | | | | |
| 46-47 | 0 | 0-0 | 0 | 0-0 | | | | |
| 44-45 | 0 | 0-0 | 0 | 0-0 | | | | |
| 42-43 | 0 | 0-0 | 0 | 0-0 | | | | |
| 40-41 | 0 | 0-0 | 0 | 0-0 | | | | |
| 38-39 | 1 | 0-0 | 0 | 0-0 | | | | |
| 36-37 | 3 | 2-1 | 0 | 0-0 | | | | |
| 34-35 | 6 | 7-4 | 5 | 2-0 | | | | |
| 32-33 | 11 | 15-11 | 13 | 11-5 | | | | |
| 30-31 | 13 | 27-2 | 16 | 26-18 | | | | |
| 28-29 | 30 | 49-3 | 36 | 52-34 | | | | |
| 26-27 | 13 | 70-61 | 16 | 78-70 | | | | |
| 24-25 | 11 | 82-7 | 9 | 90-86 | | | | |
| 22-23 | 8 | 92-8 | 2 | 96-95 | | | | |
| 20-21 | 4 | 98-9 | 3 | 98-97 | | | | |

| SET SWITCH | CHECK #1 | CHECK #2 | CHECK #3 | CHECK #4 | DESCRIPTION |
|---|---|---|---|---|---|
| 000 | 0 | 0 | | | RADAR ANGLE |
| 100 | 100 | 100 | | | TOTAL ENTRIES |
| 200 | 28.8 | 29.0 | | | AVE. DISTRIBUTION |
| 300 | 28.9 | 29.1 | | | 50TH PERCENTILE SPEED |
| 400 | 33.1 | 32.5 | | | 85TH PERCENTILE SPEED |
| 500 | 4.0 | 3.3 | | | STANDARD DEVIATION |
| 600 | n/a | n/a | | | % OF VEHICLES |
| 700 | n/a | n/a | | | % VEHICLES IN SPEED |
| 800 | n/a | n/a | | | SAMPLE DISTRIBUTION |
| 900 | n/a | n/a | | | LOWEST SPEED |

**ROAD:** Route 120 over Railroad St. & MNRR

**COUNTY:** Westchester

**TOWN:** New Castle

**COMMENTS:** Posted Speed Limit 30

| SPEED CHARACTERISTICS | CHECK #1 | CHECK #2 | CHECK #3 | CHECK #4 |
|---|---|---|---|---|
| 10-MILE PACE | | | | |
| % IN PACE | | | | |
| LEGAL LIMIT | | | | |
| % OVER | | | | |
| % OVER MPH | | | | |
| % OVER MPH | | | | |
| % OVER MPH | | | | |

**CHECK #1**  DATE: 3/30/99

TIME: 12:20 - 12:30 pm

WEATHER: Sunny

LOCATION: 100m West of Bridge

PAVEMENT: Dry, Asphalt Concrete

**CHECK #2**  DATE: 3/30/99

TIME: 12:40 - 1:00 pm

WEATHER: Sunny

LOCATION: 100m West of Bridge

PAVEMENT Dry, Asphalt Concrete

**CHECK #3**  DATE:

TIME:

WEATHER:

LOCATION:

PAVEMENT:

**CHECK #4**  DATE:

TIME:

WEATHER:

LOCATION:

PAVEMENT:

SPEED CHECK BY: S. Karge, W. Auyeung, C. Bowser



**MEMORANDUM**
**DEPARTMENT OF TRANSPORTATION**

**TO:** B. I. Mattice, Regional Structures Group, Region 8
attn.: S. Karge

**FROM:** R. J. Rella, Traffic Engineering & Safety Group, Region 8

**SUBJECT:** PIN 8026.08; Route 120 over Railroad Street and MNRR (BIN 1037350)
Westchester County

**DATE:** April 13, 1999

This is in response to your memorandum of March 30, 1999, regarding the design speed
for the above referenced project.

We concur with your proposed design speed of 60 km/h (37 MPH±) for Route 120.

RJR



**New York State Department of Environmental Conservation**
**Division of Fish, Wildlife & Marine Resources**
**New York Natural Heritage Program**
625 Broadway,  5ᵗʰ floor,  Albany, New York  12233-4757
**Phone:** (518) 402-8935  •  **FAX:** (518) 402-8925

Denise M. Sheehan
Commissioner

October 23, 2006

**RECEIVED**

Kevin P Rooney
Clark Patterson Associates
186 North Water Street
Rochester, NY 14604

**OCT 2 5 2006**

**CLARK PATTERSON ASSOCIATES**

Dear Mr. Rooney:

In response to your recent request, we have reviewed the New York Natural Heritage Program databases with respect to an Environmental Assessment for the proposed Road Reconstruction - Rte 120 from Hunts Place/Douglas to BIN 1037350, area as indicated on the map you provided, located in the Town of New Castle, Westchester County.

We have no records of known occurrences of rare or state-listed animals or plants, significant natural communities, or other significant habitats, on or in the immediate vicinity of your site.

The absence of data does not necessarily mean that rare or state-listed species, natural communities or other significant habitats do not exist on or adjacent to the proposed site. Rather, our files currently do not contain any information which indicates their presence. For most sites, comprehensive field surveys have not been conducted. For these reasons, we cannot provide a definitive statement on the presence or absence of rare or state-listed species, or of significant natural communities. This information should not be substituted for on-site surveys that may be required for environmental assessment.

Our databases are continually growing as records are added and updated. If this proposed project is still under development one year from now, we recommend that you contact us again so that we may update this response with the most current information.

This response applies only to known occurrences of rare or state-listed animals and plants, significant natural communities and other significant habitats maintained in the Natural Heritage Data bases. Your project may require additional review or permits; for information regarding other permits that may be required under state law for regulated areas or activities (e.g., regulated wetlands), please contact the appropriate NYS DEC Regional Office, Division of Environmental Permits, at the enclosed address.

Sincerely,

Jean Pietrusiak, Information Services
New York Natural Heritage Program

Enc.
cc:    Reg. 3, Wildlife Mgr.



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
New York Field Office
3817 Luker Road
Cortland, NY 13045
Phone: (607) 753-9334 Fax: (607) 753-9699
http://www.fws.gov/northeast/nyfo



In Reply Refer to
Project Number: **70009**

To: **Kevin Rooney**           Date: **10-3-03**

Regarding: **Reconstruction of NYS Route 120**

Town/County: **Town of New Castle / Westchester**

The U.S. Fish and Wildlife Service's New York Field Office (Service) has received your request for information regarding occurrences of Federally-listed threatened and endangered species within the vicinity of the above-referenced project/property. Due to increasing workload and reduction of staff, we are no longer able to reply to endangered species list requests in a timely manner. Our current average processing time for letters is approximately 3-4 months from the date of receipt. In an effort to streamline project reviews, we are shifting all species list requests to our website at http://www.fws.gov/northeast/nyfo/es/section7.htm. However, for the next few months, we would like to offer you the choice of either having the Service review your project and provide information regarding listed species presence in writing, or you may review the materials provided on our website to determine potential listed species presence. Step-by-step instructions are found on our website. Please check your preferred processing method below and return by FAX to the Service. If we receive no response within 30 days from the date of this FAX, we will assume that you will be conducting this review.

**X**    I would like the Service to review the above-referenced project and provide a written response.

_____ I will conduct project screening using the Service's website.

As a reminder, Section 9 of the Endangered Species Act (ESA) (87 Stat. 884, as amended; 16 U.S.C. 1531 et seq.) prohibits unauthorized taking of listed species and applies to Federal and non-Federal activities. Additionally, endangered species and their habitats are protected by Section 7(a)(2) of the ESA, which requires Federal agencies, in consultation with the Service, to ensure that any action it authorizes, funds, or carries out is not likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. An assessment of the potential direct, indirect, and cumulative impacts is required for all Federal actions that may affect listed species.

Project construction or implementation should not commence until all requirements of the ESA have been fulfilled. If you have any question or require further assistance regarding threatened or endangered species, please contact the Reviewing Biologist at (607) 753-9334. Please refer to the above document control number in any future correspondence.

Reviewing Biologist: _____Robyn A. Niver_    **RAN**

# PEDESTRIAN GENERATOR CHECKLIST

| | | |
|---|---|---|
| 1. | Is there an existing or planned sidewalk, trail, or pedestrian crossing facility? | YES☑ NO☐ |
| 2. | Are there bus stops, transit stations, or depots/terminals located in or within 800 m of the project area? | YES☑ NO☐ |
| 3. | Is there more than occasional pedestrian activity? Evidence of pedestrian activity may include a worn path. | YES☑ NO☐ |
| 4. | Are there existing or approved plans for generators of pedestrian activity in or within 800 m of the project that promote or have the potential to promote pedestrian traffic in the project area, such as schools, parks, playgrounds, places of employment, places of worship, post offices, municipal buildings, restaurants, shopping centers or other commercial areas, or multiuse paths? | YES☑ NO☐ |
| 5. | Are there existing or approved plans for seasonal generators of pedestrian activity in or within 800 m of the project that promote or have the potential to promote pedestrian traffic in the project area, such as ski resorts, state parks, camps, amusement parks? | YES☐ NO☑ |
| 6. | Is the project located in a residential area within 800 m of existing or planned pedestrian generators such as those listed in #4? | YES☑ NO☐ |
| 7. | From record plans, were pedestrian facilities removed during a previous highway reconstruction project? | YES☐ NO☑ |
| 8. | Did a study of secondary impacts indicate that the project promotes or is likely to promote commercial and/or residential development within the intended life cycle of the project? | YES☐ NO☑ |
| 9. | Does the community's comprehensive plan call for development of pedestrian facilities in the area | YES☑ NO☐ |
| 10. | Based on the ability of students to walk and bicycle to school, would the project benefit from engineering measures under the Safe-Routes-To-School program? Eligible infrastructure-related improvements must be within a 3.2 km radius of the project. | YES☐ NO☑ |
| | Developer   **Clark Patterson Associates** | **Date:** 10/25/2006 |



**New York State Office of Parks, Recreation and Historic Preservation**
Historic Preservation Field Services Bureau
Peebles Island, PO Box 189, Waterford, New York 12188-0189

NEW YORK STATE
Bernadette Castro
*Commissioner*

518-237-8643

December 15, 2005

Sandra D. Jobson, RLA, AICP
Cultural Resource Coordinator
NYS Dept. of Transportation-Region 8
4 Burnett Boulevard
Poughkeepsie, NY 12603

DEC 2 2 2005
RECEIVED
REGION 8 DESIGN

Re: FHWA/DOT PIN 8026.08.101
BIN 1037350
Rt 120 Bridge over Metro
Chappaqua, Westchester County
05PR05945

Dear Ms. Jobson:

Thank you for requesting the comment of the State Historic Preservation Office (SHPO). We have had an opportunity to initiate the review of the project in accordance with Section 106 of the National Historic Preservation Act of 1966 and relevant implementing regulations.

Based upon our review of the submitted Finding Documentation, the SHPO concurs with the opinion that the replacement of the subject bridge will result in an **Adverse Effect** upon the property that has been determined to be eligible for inclusion in the National Register of Historic Places. Although the submitted report provides substantial information regarding the difficulty in adapting the existing bridge to the project requirements, we will need more information regarding the proposed replacement before we can help develop an agreement for the project.

Please forward additional project information once the material becomes available. If you have questions, please call me at your convenience. Ext. 3273.

Sincerely,

Kenneth Markunas
Historic Sites
Restoration Coordinator

Cc: Robert Arnold, FHWA
    Daniel Hitt, Main DOT EAB

An Equal Opportunity/Affirmative Action Agency
printed on recycled paper

347 Madison Avenue
New York, NY 10017-3739
212 340-3000

Peter A. Cannito
President

SEP 1 2 2000

 **Metro-North Railroad**

September 1, 2000

Marion S. Sinek
Supervisor
Town of New Castle
200 South Greeley Avenue
Chappaqua, New York 10514

**Re: Route 120 Bridge Over Metro-North Tracks in Chappaqua**

Dear Supervisor Sinek:

Thank you for your letter of August 17, 2000 regarding the proposed
reconstruction of the bridge carrying Route 120 over the Metro-North
tracks and the Saw Mill River Parkway in Chappaqua.

There presently is no freight service operated over that portion of the
Harlem Line passing through Chappaqua and we are not aware of any
plans to establish freight service in the future. We would be satisfied with
maintenance of the existing 19-foot 4-inch clearance above the top of rail
at this location. While we cannot speak for the New York State
Department of Transportation on this matter, it is reasonable to assume
they would go along with the lower clearance in view of the physical
difficulties with the roadway at this location and the fact that there is no
freight service being operated through the area.

Sincerely yours,

Richard K. Bernard
Vice President and General Counsel
RKB:aa

cc:    Genny Firnhaber
       Howard Permut
       George Walker
       Walter Zullig, Jr.

MTA Metro-North Railroad is an agency of the Metropolitan Transportation Authority, State of New York
E. Virgil Conway, Chairman

**New York State Department of Environmental Conservation**
Division of Fish, Wildlife & Marine Resources
Wildlife Resources Center ~ New York Natural Heritage Program
700 Troy-Schenectady Road, Latham, New York 12110-2400
Phone: (518) 783-3932   FAX: (518) 783-3916

RECEIVED

AUG 1 0 2000

Clark Patterson Associates

John P. Cahill
Commissioner

August 8, 2000

Kevin Rooney
Clark Patterson Associates
186 North Water St
Rochester, NY 14604

Dear Mr. Rooney:

In response to your recent request, we have reviewed the New York Natural Heritage Program databases with respect to the proposed Rte 120 Bridge Rehabilitation over the Metro North Railroad, BIN 1037350, site as indicated on the map you provided, located in the Town of New Castle, Westchester County.

> We have no records of <u>known</u> occurrences of rare or state-listed animals or plants, significant natural communities, or other significant habitats, on or in the immediate vicinity of your site.

The absence of data does not mean, however, that rare or state-listed species, natural communities or other significant habitats do not exist on or adjacent to the proposed site, but rather that our files currently do not contain any information which indicates their presence. For most sites, comprehensive field surveys have not been conducted. For these reasons, we cannot provide a definitive statement on the presence or absence of rare or state-listed species, or of significant natural communities. This information should <u>not</u> be substituted for <u>on-site</u> surveys that may be required for environmental assessment.

Our databases are continually growing as records are added and updated. If this proposed project is still under development one year from now, we recommend that you contact us again so that we may update this response with the most current information.

This response applies only to known occurrences of rare or state-listed animals, and plants, significant natural communities, and other significant habitats. For information regarding regulated areas or permits that may be required under state law (e.g., <u>regulated wetlands</u>), please contact the appropriate NYS DEC Regional Office, Division of Environmental Permits, at the enclosed address.

Sincerely,

Betty Ketcham

Betty A. Ketcham,  Information Services
NY Natural Heritage Program

Enc.
cc:   Reg. 3, Wildlife Mgr.

FILE



**MEMORANDUM**
**DEPARTMENT OF TRANSPORTATION**

TO:    R.J. Rella, Traffic Engineering & Safety Group, Region 8

FROM:   B. I. Mattice, Regional Bridge Design Engineer, Region 8   *BIM*

SUBJECT:  **PIN 8026.08**
      **ROUTE 120 OVER RAILROAD STREET & MNRR (BIN 1037350)**
      **TOWN OF NEW CASTLE**
      **WESTCHESTER COUNTY**

DATE:   March 30, 1999

      We are preparing the EPP/DR for the subject bridge rehabilitation project and
      propose to use a design speed of 60 km/h (37.28 mph). A copy of the radar speed
      study performed on March 30, 1999 by Regional Bridge Design personnel is
      attached for your review.

      Please advise us of your concurrence or disapproval as soon as possible.

      If you have any questions, please phone Sandra Karge at 431-5935.

      BIM:AOF:SDK
      Attachment

# EXHIBIT I



APPROVED
By Napoli at 2:17 pm, Jul 11, 2008

Case 7:08-cv-07325-SCR Document 2-7 Filed 08/20/2008 Page 18 of 23

Case 1:08-cv-07325-SCR    Document 2-7    Filed 08/20/2008    Page 19 of 19

Case 7:08-cv-07325-SCR    Document 2-7    Filed 08/20/2008    Page 20 of 23





# EXHIBIT J

# SUPERVISOR'S REPORT --- February 8, 2008

Last month several members of Town staff and I attended a meeting in Poughkeepsie called by the NYS Dep't of Transportation to discuss the status of the reconstruction of the Bridge over the MetroNorth railroad tracks. Mr. Faiella, Ms. Paderewski, our Commissioner of the Dep't of Public Works and his deputy, as well as Chief of Police, Provisional, Jim Baynes and two members of his department were present for the meeting---

It is important for everyone to realize the DOT has had our bridge on its radar for major repair since before the year 2000 --- the Town objected to piecemeal repair, because removing and replacing pieces of the bridge one at a time would have left the Town with a single lane bridge for the anticipated 24 months of the project.   The decision was made to reconstruct the bridge in its entirety to ensure two-way traffic at all times.

In the interim 8 years the bridge has continued to deteriorate ---- at this point it is described as "Structurally deficient" --- not, of course, at a dangerous level --- but no one is going to wait for the condition to go from structurally deficient to dangerous condition. --- the DOT would be forced to close the bridge ---

The bridge was built in 1930 for then specifications --- remembering that New Castle's population at the time according to the Census Bureau was 6,792 residents --- as opposed to our current 17,800 --- and the number of vehicles has at least tripled if not quadrupled in those 78 years ---
The most-recent estimate for vehicular traffic over the bridge is **approximately 14,000 a day!**

As many of you know, the traffic consultants had recommended a series of 3 traffic lights to aid in the flow of traffic in and out of the hamlet ---

1

---

[From New Castle Town website
www.town.new-castle.ny.us
"Latest News" - Rte 120 Bridge Reconstruction/
Update ]

When that suggestion was presented to the public 2 things were very clear:

1. no one wanted to have traffic lights in the hamlet, and

2. no one wanted to lose the Town triangle.

Given those design constraints, as well as the shifting focus in the entire community to pedestrian amenities and safety, two years of re-design were done to arrive at a safe, attractive alternative, that in addition offers several additional feet on the bridge as one enters the hamlet --- allowing for clearer direction, better sight lines, and hopefully reduced back up over the bridge.

One thing we know for certain, without the traffic lights, if the bridge were rebuilt at the exact same width, we would have the exact same problems that currently exist.

The current plans provide for 3 travel lanes of 12 feet each --- the current design standard --- 2 entering and 1 exiting the hamlet.   The sidewalks on both sides of the bridge will also be replaced ---

The state also provided the Town with the option of four different guide rail treatments to meet today's design standards.   The Board did not find any of the "four rail galvanized steel" designs or the use of pre-cast concrete barriers to be attractive ---

instead the Town opted for **granite walls with a coping stone,** similar to the treatment found on the bridge's separate but companion bridge over the Saw Mill River Parkway.

The State also agreed to line the retaining wall on the south side of the project to provide a landscaping opportunities for shrubs and trees.   They will also install granite curbing throughout the project site and install the historic decorative lighting to replicate the look of the original structure.
In the northerly direction, they will increase the turning radius at the intersection of Rte 120 with Hunts Lane to allow busses to make the right

2



TREE REMOVAL

STATE OF NEW YORK
DEPARTMENT OF TRANSPORTATION
REGION 8



James J. Periconi
Delight D. Balducci
PERICONI, LLC
708 Third Avenue, 17th Floor
New York, New York 10017
(212) 213-5500
*Attorney for the Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------X

CONCERNED CITIZENS OF CHAPPAQUA
AND CHARLES NAPOLI.

                              Plaintiffs,

            -against-

FEDERAL HIGHWAY ADMINISTRATION,
NEW YORK STATE DEPARTMENT OF
TRANSPORTATION,

                              Defendants.

------------------------------------------------------X

CIVIL ACTION

DOCKET NO.:

**AFFIDAVIT**

PETER BARTLETT, being duly sworn, deposes and states:

1. I am a certified arborist in the State of New York, currently employed

by Westchester Tree Life, which is based in Chappaqua. I was also born and raised in

Chappaqua, and have a special affection for the hamlet. I submit this affidavit in support

of the application for a temporary restraining order and motion for a preliminary

injunction sought by plaintiffs in the above-captioned matter. I am aware of the subject

matter of the complaint, namely, the plan by the New York State Department of

Transportation to replace the existing historical Route 120 bridge that requires site

clearance and tree removal.

2. At the request of plaintiffs, I made a site inspection of the 61 trees

surrounding the existing Route 120 bridge that I was informed would be felled as part of

site clearance in preparation for the demolition of the existing bridge. My informant was

one of the plaintiffs, namely, Charles Napoli, who showed me New York State

Department of Transportation drawings entitled "Tree Removal." Nearly all of the trees

discussed by me in this affidavit – about half of the 61 trees – are reflected in the

attached plans.

3. Of the 61 trees, at least half are of great value, some irreplaceable, in my

view. In this latter category, there are nearly a dozen large sycamores and oak trees,

some of 50-70 feet in height, nearly all 75 years old or older. They are in good health

and vigor, and provide a tremendous amount of shade in the summertime.

4. Some of these may be considered specimen trees, in that they

are mature, healthy, desirable species, in desirable locations. _____.

5. Among the other noteworthy trees that I saw that are on the NYSDOT

plan to be removed are sweet gums,,, bradford pears, eastern white cedar and black

walnut trees.

6. I believe that the removal of these trees would create a great sense of loss

to the residents of and those working and visiting in Chappaqua: trees provide a

community like Chappaqua with a sense of tranquility, historical reference and stability.

_____
PETER BARTLETT

Sworn to before me this
16 day of August, 2008
_____
James J. Periconi
Notary Public

JAMES J. PERICONI
Notary Public, State of New York
No. 4954128
Qualified in Westchester County
Commission Expires March 24, 2009



| | | |
|---|---|---|
| P.I.N. 8026.08 | | B.I.N. 1037350 |
| ROUTE 120 | | WESTCHESTER COUNTY |
| CRYSTAL SPRINGS-CHAPPAQUA-MILLWOOD | | |
| S.H. 1015. NY ROUTE 120 | | |
| ROUTE 120 OVER METRO NORTH R.R. AND RAILROAD ST. | | |
| TOWN OF NEW CASTLE | | |

REMOVE SHRUBS ITEM 201.06.
CLEARING & GRUBBING

22'

UTILITY QUALITY LEVEL D
ALL DIMENSIONS ARE IN m UNLESS OTHERWISE NOTED

AS BUILT REVISIONS

SIGNATURE          DATE

TREE REMOVAL

STATE OF NEW YORK
DEPARTMENT OF TRANSPORTATION
REGION 8

| DOCUMENT NAME | DATE | DRAWING NO. |
|---|---|---|
| 802608_cph_lap2.dgn | 10/2007 | LAN-02 |

SCALE  0  5  10  15  20  25 M

